PEOPLES RIGHTS ORGANIZATION, INC. et al., Appellants,

v.

MONTGOMERY, Atty. Gen., Appellee.

[Cite as *Peoples Rights Org., Inc. v. Montgomery* (2001), 142 Ohio App.3d 443.]

Court of Appeals of Ohio,
Twelfth District, Madison County.

No. CA2000–04–018.

Decided April 9, 2001.

444

446

448

450

452

454

456

458

*David M. Buda,* for appellants.

*Stephen P. Halbrook,* for appellants *pro hac vice.*

*Betty D. Montgomery,* Attorney General, *Judith L. French, Arthur J. Marziale, Jr.* and *Darrell M. Pierre, Jr.,* Assistant Attorneys General, for appellee.

WILLIAM W. YOUNG, Judge.

Plaintiffs-appellants (collectively "appellants"), Peoples Rights Organization ("PRO"), Big Boys Toys I, Inc., d.b.a. Davis Guns ("Davis Guns"), John Does I, II, and III, and Jane Does I and II, appeal the decision of the Madison County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Betty D. Montgomery, Ohio Attorney General ("Attorney General").[1]

## A. FACTS

This case involves a class action suit by appellants to recover the fees charged ("Brady fees") to conduct background checks ("Brady checks") for the purchase of handguns. The facts of the case are not in substantial dispute, and they are presented fully after a brief overview of the procedural history.

### 1. Overview

---

1. The events underlying this case began when Attorney General Montgomery's predecessor, Lee Fisher, held that office. For consistency, we will refer to the office of Attorney General, rather than the individual Attorneys General, except where it is necessary to refer to them in their non-official capacities.

PRO is a nonprofit organization incorporated in Ohio "dedicated to the rights of law-abiding firearm owners." Many of its members purchased handguns in Ohio between 1994 and 1998, paying the Brady fee, which they now seek to have refunded. Davis Guns is a federally licensed firearms dealer located in Plain City, Madison County, Ohio, which paid the Brady fee as part of promotional sales. John and Jane Does are Ohio residents and handgun purchasers who seek to remain anonymous. Some of them are PRO members.

Appellants filed a class action suit against the Attorney General seeking a refund of all Brady fees paid by handgun purchasers in Ohio for Brady checks pursuant to the Brady Handgun Violence Prevention Act ("Brady Act"), Section 921 *et seq.*, Title 18, U.S.Code[2] and a subsequent agreement between the Attorney General and the United States Attorney General ("USAG"), which continued the Brady checks after certain provisions of the Brady Act were declared unconstitutional by the United States Supreme Court in *Printz v. United States* (1997), 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914. The Attorney General assigned the Ohio Bureau of Criminal Investigation and Identification ("BCI&I") to collect the Brady fee. Appellants alleged that the Brady fee was not authorized by law and infringed upon their rights to bear arms and to due process of law.

Both parties filed motions for summary judgment. The Attorney General argued that charging and collecting the Brady fee to perform Brady checks was legal and not in violation of appellants' civil rights. The trial court granted the Attorney General's motion, finding that the Brady fees were authorized. Appellants' motion was overruled.

2. The Brady Act

The events of this case involve a number of government agencies.[3] The Gun Control Act of 1968 ("GCA"), Sections 921–930, Title 18, U.S.Code, established a

---

**2.** For convenience, we shall refer to only the applicable section where citing a Title 18, U.S.Code provision.

**3.** Much of the facts concerning the enactment and history of the Brady Act are taken from the United States Supreme Court's decision in *Printz*, 521 U.S. at 902–904, 117 S.Ct. at 2368–2369, 138 L.Ed.2d at 923–925, and other federal court opinions. *Frank v. United States* (C.A.2, 1996), 78 F.3d 815, vacated (1997), 521 U.S. 1114, 117 S.Ct. 2501, 138 L.Ed.2d 1007; *Roy v. Kentucky State Police* (W.D.Ky.1995), 881 F.Supp. 290; *Printz v. United States* (D.Mont. 1994), 854 F.Supp. 1503, reversed (1995), 66 F.3d 1025, reversed (1997), 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914; *Koog v. United States* (W.D.Tex.1994), 852 F.Supp. 1376, reversed (1996), 79 F.3d 452, certiorari denied (1997), 521 U.S. 1118, 117 S.Ct. 2507, 138 L.Ed.2d 1011. The facts underlying events in Ohio are taken from the record and the trial court's decision. This includes significant quoting from letters and memoranda bearing on Ohio, conducting background checks. Such extensive quoting cannot be helped, as these quotes directly concern the powers vested in Ohio authorities regarding the propriety of

detailed federal scheme governing the distribution and sale of firearms. The scheme requires that any person dealing in firearms first obtain a federal license. Section 923. Federal firearm licensees ("FFLs"), such as Davis Guns, must maintain records of their sales and allow the Bureau of Alcohol, Tobacco, and Firearms ("ATF") to inspect these records. Section 923(g). The scheme includes a prohibition against transferring handguns to, and the possession of firearms by, certain listed classes of persons. Sections 922(b), (d), and (g).

Congress amended Title I of the GCA effective November 30, 1993, with the Brady Act, Pub.L. 103–159, 107 Stat. 1536. The Brady Act put into place interim provisions for a national background check system, Section 922(s), and required that the USAG establish a permanent national instant background check system by November 30, 1998. Section 922(t)(1). The Brady Act's interim system implemented a mandatory background check, the Brady check, and a five-day waiting period for the purchase of a handgun. Section 922(s)(1)(A)(ii). The permanent instant background check system requires no waiting period. Section 922(t)(1).[4]

As noted by the trial court, under the interim provision, a FFL who proposed to transfer a handgun had to:

"(1) receive from the transferee/buyer ('buyer') the form prescribed by Section 922(s)(3) ('Brady form'), containing the name, address, and date of birth of the buyer, along with a sworn statement that the buyer is not among any of the classes of prohibited purchasers,[5] Section 922(s)(1)(A)(i)(I);

"(2) verify the identity of the buyer by examining an identifying document, Section 922(s)(1)(A)(i)(II); and

"(3) provide the 'chief law enforcement officer' ('CLEO')[6] of the buyer's residence with a notice of the contents and a copy of the Brady form. Section 922(s)(1)(A)(i)(III)–(IV)." (Footnotes added.)

---

background checks and whether Ohio's Attorney General reached the proper conclusion as to the state's power to conduct such background checks.

**4.** Throughout this opinion, some discussion will be in the present tense, while other discussion will be in the past tense. This is intentional. Some sections of the GCA and Brady Act are still effective, while others are not. The actions of the parties and government agencies preceding this opinion will, of course, be discussed in the past tense.

**5.** The Brady form, ATF Form 5000.35, was prepared by the ATF, to which the United States Secretary of the Treasury delegated the responsibility of implementing the GCA and the Brady Act's background check system. See former Section 178.102, Title 27, C.F.R.; see, also, *Frank*, 78 F.3d at 820–821.

**6.** The definition and status of CLEOs are fully discussed below. All CLEOs were state and/or local law enforcement officials.

Other than listed exceptions, the FFL was required to wait five business days before consummating the sale unless the CLEO earlier notified the FFL that there was no reason to believe that the sale would be illegal. Section 922(s)(1)(A)(ii). There were significant alternate methods of completing a handgun sale, including where the buyer possessed a state handgun permit issued after a state background check, Section 922(s)(1)(C), and where state law provided for an instant background check. Section 922(s)(1)(D).

If a particular state, like Ohio, did not have in effect one of these alternatives applicable to all handgun buyers, CLEOs performed specific duties regarding Brady checks. Sections 922(s)(2) and (6). Thus, unless a state already had a system for approving the sale of handguns to prospective buyers, CLEOs were instrumental in administering the Brady Act's interim system.[7]

When the CLEO received the required notice of a proposed sale from the FFL, the CLEO was to "make a reasonable effort"[8] to ascertain within five business days whether receipt or possession would be illegal, including research in state and local recordkeeping systems and a national system designated by the USAG. Section 922(s)(2). The CLEO was not required to take any particular action if it was determined that a pending sale would be unlawful,[9] but if the CLEO informed the FFL that the prospective buyer was ineligible to receive a handgun, the CLEO had to provide the prospective buyer with a written statement of the reasons for that determination. Section 922(s)(6)(C). If the CLEO did not discover a basis for objecting to the sale, any records in its possession relating to the sale, including the Brady form, were to be destroyed within twenty days. CLEOs could not convey the information in the Brady form to any other person or use it for any purpose other than the Brady check. Section 922(s)(6)(B).

If the CLEO provided erroneous information, resulting in a denial of a handgun application, the denied buyer could "bring an action against the State or political subdivision responsible for providing the erroneous information." Sec-

---

**7.** CLEOs are not involved in the permanent Brady system. FFLs may directly access this system by telephone or other electronic device. Pub.L. 103–159, Section 103(b), 107 Stat. 1541, as amended, Pub.L. 103–322, 108 Stat. 2074, as amended, Pub.L. 104–294, 110 Stat. 3504.

**8.** "Reasonable effort" was, in fact, a mandate that a background check be performed, unless certain exceptions were applicable. In general, CLEOs did not have the discretion to decide not to perform a background check. *Printz*, 521 U.S. at 903, 933, 117 S.Ct. at 2369, 2383– 2384, 138 L.Ed.2d at 924–925, 943. The mandatory nature of this provision was more fully described by the federal district courts. *McGee v. United States* (S.D.Miss.1994), 863 F.Supp. 321, 326, affirmed (1996), 79 F.3d 452, certiorari denied (1997), 521 U.S. 1118, 117 S.Ct. 2507, 138 L.Ed.2d 1011; *Printz*, 854 F.Supp. at 1512.

**9.** "[I]t is perhaps assumed that their state-law duties will require prevention or apprehension[.]" *Printz*, 521 U.S. at 904, 117 S.Ct. at 2369, 138 L.Ed.2d at 925.

tion 925A. CLEOs were specifically exempted from civil liability for performing their duties under the Brady Act. Section 922(s)(7). Under a separate section of the GCA, "[w]hoever knowingly violates subsection (s) or (t) of section 922 [could] be fined not more than $1,000, imprisoned for not more than [one] year, or both." Section 924(a)(5).[10]

On January 21, 1994, before the Brady Act's effective date, the Director of the ATF sent an "Open Letter to State and Local Law Enforcement Officials" ("Open Letter") explaining the Brady Act's interim requirements. The Open Letter stated that the Brady Act's primary intent was to "provide law enforcement an opportunity to screen out unlawful purchasers. Our goal is to see that [the] Brady [Act] is as effective as possible at keeping handguns out of the wrong hands." The Open Letter addressed how the background checks should be performed:

"Each law enforcement agency serving as the CLEO will have to set it [sic] own standards based on its own circumstances, i.e., the availability of resources, access to records, and taking into account the law enforcement priorities of the jurisdiction. The law is designed so that the law enforcement authority who is doing the check [sic], is the one who is most likely to have to deal with the consequences of the buyer obtaining a handgun. Therefore, the CLEO of the buyer's residence has a vested interest in conducting an appropriate check and ultimately is in the best position to determine what is reasonable."

The Open Letter concluded by noting that in some situations the only reasonable Brady check would be no check at all, in accordance with circumstances predicted by Sections 922(s)(1)(B)–(F) and by the ATF in its administrative regulations.[11]

3. CLEOs

"CLEO" was defined as "the chief of police, the sheriff, or an equivalent officer or the designee of any such individual." Section 922(s)(8). The Brady Act gave no express guidance in how a "designee" CLEO was to be appointed or whether

---

**10.** Whether these criminal sanctions are applicable to law enforcement officers is disputed. *Romero v. United States* (W.D.La.1994), 883 F.Supp. 1076, 1079–1080, concluded that the penalty provision does not apply to law enforcement officers, relying upon a memorandum from the Office of Legal Counsel of the United States Department of Justice refusing to enforce the criminal provision against law enforcement officers. *Koog*, 852 F.Supp. at 1388–1389, reached the same conclusion through statutory analysis. But the court in *Mack v. United States* (D.Ariz.1994), 856 F.Supp. 1372, 1376–1377, reversed (1995), 66 F.3d 1025, reversed (1997), 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914, disagreed, relying upon the broad language of the penalty statute, which does not expressly exempt law enforcement officers. The United States Supreme Court did not consider this issue in *Printz* and has yet to address it.

**11.** Sections 178.102(d) and 178.150, Title 27, C.F.R.

only local, not state, law enforcement officers could act as CLEOs. In any case, CLEOs, as the key law enforcement officers administering the interim Brady Act system, were to be state, not federal, officers. As noted by the United States Supreme Court:

"[T]he Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme. Regulated firearms [FFLs] are required to forward Brady [f]orms not to a federal officer or employee, but to the CLEOs, whose obligation to accept those forms is implicit in the duty imposed upon them to make 'reasonable efforts' within five days to determine whether the sales reflected in the forms are unlawful. While the CLEOs are subjected to no federal requirement that they prevent the sales determined to be unlawful (it is perhaps assumed that their state-law duties will require prevention or apprehension), they are empowered to grant, in effect, waivers of the federally prescribed 5–day waiting period for handgun purchases by notifying gun [FFLs] that they have no reason to believe the transactions would be illegal." *Printz*, 521 U.S. at 904–905, 117 S.Ct. at 2369, 138 L.Ed.2d at 925.

The Open Letter also discussed CLEO status:

"While the law [defining 'CLEO,' Section 922(s)(8),] is broad enough, in some cases, to give the [FFL] more than one official to contact, we believe the law will clearly permit law enforcement officials to agree that, within a given jurisdiction, one agency will serve the role as CLEO. It is essential that State and local law enforcement officials agree, within a given jurisdiction, that one agency will serve the role of [CLEO], for purposes of which agency should receive the notice of handgun sales.

" * * * *

"We urge you to work with your counterparts on the State and local level to decide who will be the CLEO for your area. Your discussions should also include consideration of the designation of the CLEO for the purposes of the 'threat to life' alternative * * * and the 'multiple sales reports[.]' * * * Once you have reached a determination, ATF will be able to inform the [FFLs] when they begin calling us[.] ATF"s regulations will make it clear to [FFLs] that they will be required to abide by instructions from State and local officials as to which agency to contact."

In response to the Open Letter, on February 22, 1994, the Superintendent of the BCI&I ("Superintendent") sent a letter to every Ohio FFL outlining how the Brady checks were to be conducted. The Superintendent indicated that the Brady checks would be conducted by the BCI&I, setting forth specific procedures. Using a "900" telephone number, each FFL was to call the BCI&I's

Identification Division, which would conduct computerized criminal background checks. There would be a $15-per-call charge (the Brady fee) assessed to the FFL's telephone bill.[12]

### 4. Ohio in the Pre–*Printz* Period

At the time that the Brady Act took effect, Ohio did not have a system of handgun purchase background checks in place.[13] As a result, Ohio was subject to Section 922(s), and the state acted accordingly. One of the first steps in this process was determining who would be a CLEO.

On February 25, 1994, the Ohio Association of Chief of Police, Inc. ("OACP") sent a letter regarding the Brady Act to its members. Drafted by the OACP President and Todd Wurschmidt, Ph.D., the letter began, "On behalf of our OACP members, we have been involved in gathering a great deal of information and in dialoging with a number of federal and state agencies with regard to the implications of the Brady [Act] for local law enforcement agencies in Ohio." Regarding who was to act as Ohio's CLEO and that official's responsibilities, the letter stated:

"1. Through the efforts of the Attorney General's Office and BCI&I, Ohio is attempting to establish a central repository for background checks through BCI&I. We have agreed to support the proposal designating BCI&I as Ohio's central repository. Thus, ATF has notified more than 9,000 [FFLs] to telephone BCI&I with information regarding the request for purchase of handguns.

"* * *

"2. If an FFL contacts your local agency, you simply need to provide them with the BCI&I (900) number * * *. It is the responsibility of the FFL to comply with the contact to BCI&I.

"* * *

"4. BCI&I informs us that they understand local law enforcements' [*sic*] interest in learning about persons residing in their communities who are either rejected from purchase of handguns or who attempt to purchase multiple handguns. [The] Superintendent * * * informed us of BCI&I's intentions to address this issue, but does not have specific plans nor a timetable as of yet with regard to providing local law enforcement with feedback on ineligible purchasers

---

12. The Brady Act did not address charging fees for Brady checks; thus, it neither ordered nor prohibited the Brady fees. Presumably, this might have been a matter left to state law.

13. The Ohio General Assembly has yet to enact any statutory background check system for firearm purchases.

or multiple handgun sales. We have written [the] Superintendent * * * requesting specific information * * *.

"* * *

"5. The Brady [Act] contains a Sunset Provision after five years. The federal statute requires the implementation of a national instant criminal check system. From presentations by representatives of the FBI involved in the design of a national instant criminal background check system, we believe the national system will, in great part, rely on the networking of centralized state systems. We thus feel that with Ohio centralizing our background check process at the outset of the implementation of the Brady [Act], Ohio will be in a position to network with the possible national system to be put in place not later than five years from now."

This arrangement by which BCI&I acted as Ohio's CLEO designee was memorialized by the ATF in its Federal Register list of responsible CLEOs. 59 F.R. 37532 (1994). The arrangement was also confirmed in an ATF announcement to Ohio FFLs, which included that "for purposes of the [Brady] Act, the Chief Law Enforcement Officer in Ohio is the Attorney General, State of Ohio. The Attorney General's designee is the Superintendent[.]"

Beginning in March 1994, BCI&I began performing Brady checks. BCI&I performed such background checks until June 27, 1997. On that date, the United States Supreme Court decided *Printz*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914, and held that Section 922(s)(2), which obligated local law enforcement to perform Brady checks, violated the Tenth Amendment to the United States Constitution.[14] The court reasoned that Section 922(s)(2) imposed on state CLEOs an obligation to administer an unfunded and purely federal regulatory program. *Id.* at 933, 117 S.Ct. at 2383, 138 L.Ed.2d at 943. *Printz* effectively extinguished the duties imposed upon CLEOs by Sections 922(s)(1)(A)(i)(III) and (IV) to accept the Brady form submitted by FFLs. *Id.* at 933–934, 117 S.Ct. at 2384, 138 L.Ed.2d at 943–944.

5. Ohio in the Post-*Printz* Period

As a result of *Printz*, law enforcement officials had to find other means to perform Brady checks. To that end, the Superintendent sent a letter to Ohio's FFLs on June 30, 1997, setting forth a new plan for Brady checks:

"Over the past forty-eight hours we have worked with the [United States] Justice Department to try to respond to the new decision and the legal problems

---

14. The Tenth Amendment provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

it causes Ohio particularly. In order for you to comply with the requirements of this federal law, we are working on an interim solution with the Department of Justice to assist you in the least intrusive way possible. The new Ohio Brady plan will take effect on July 1, 1997 and will remain in effect until November 30, 1998 or until the Federal system is implemented (or until a more permanent solution can be achieved)."

Under the new system, buyers would still fill out the Brady form. The buyer could sign a waiver form, which would allow BCI&I to verify the buyer's criminal record or the lack thereof. This allowed a voluntary Brady check to be done. Both of these forms were to be sent to BCI&I, which would report its findings within two business days. The Brady fee for this system was $13 per check, still charged to the FFL via the "900" telephone number. The intent of this system was to create a method of voluntary Brady checks. The Superintendent's letter further included:

"In the event the buyer does not wish to sign the waiver form please write 'REFUSED' on the applicants signature block and send both forms to BCI&I and we will forward the check to ATF. In this event, as you know, you *must* wait 5 business days to hear from the ATF before you can sell a handgun. You will be billed $13.00 for the service.

"* * *

"It is our intent to assist you in complying with the federal mandate in a timely, cost effective and the least intrusive way possible. Signing the voluntary consent form coupled with a quick check system should afford you faster customer service while protecting you from possible liability should no record check be sought." (Emphasis *sic.*)

At that time, the federal government was encouraging states to voluntarily perform Brady checks as before, continuing the system of involuntary, mandatory checks. In some states, as in Ohio, this posed legal problems. These concerns initiated correspondence between the Attorney General and the USAG negotiating a new Brady check system.

On July 2, 1997, the Attorney General sent a letter to the USAG discussing legal impediments to the BCI&I conducting involuntary Brady checks. The Attorney General wrote:

"Ohio is a Brady state and our General Assembly has not enacted a criminal record check law. Ohio is also unique in that, in 1994, [the Attorney General] entered into an agreement with local law enforcement to be designated [CLEO] for purposes of the Brady Act. This designation allowed the BCI&I, which operates under the Attorney General's office, to conduct the Brady checks. Prior to the [*Printz*] decision, BCI&I was able to assume the workload of the Brady

checks because the performance of a background check was a 'mandatory duty' of all local law enforcement agencies pursuant to statute.

"* * *

"Since the Supreme Court nullified the *mandate* of Brady on state and local government, there is no longer a *duty* for CLEOs (or local law enforcement) to conduct Brady checks. Therefore, BCI&I's handgun background check authority under [R.C.] 109.55 *has lapsed.*" (Emphasis *sic.*)

The Attorney General continued that, although states were encouraged to continue involuntary Brady checks, Ohio was "statutorily impeded from complying with this request." R.C. 109.54, which gives the BCI&I the authority to investigate "criminal activity," was inapplicable to involuntary Brady checks: "The purchase of a handgun is *not* a criminal activity," in light of the fact that 99.5 percent of prospective buyers had no record which would prevent the sale. The Attorney General proposed:

"In the current circumstances, we believe the only legal alternative available to * * * Ohio is a voluntary compliance policy, which we are now implementing. This policy allows gun dealers to obtain a written waiver from the purchaser, thereby allowing BCI&I to conduct a voluntary record check. * * * For those individuals who do not agree to our waiver request, BCI&I will forward their applications to the appropriate federal agency which still retains *its* authority, under Brady, to conduct their own background check." (Emphasis *sic.*)

Although the Attorney General concluded that Ohio was prohibited from conducting involuntary Brady checks, the Attorney General was willing to work with federal authorities to implement a voluntary Brady check system. To this end, the Superintendent sent a letter to the ATF outlining the legal impediments to BCI&I conducting involuntary Brady checks. The Superintendent notified the ATF that, pursuant to Ohio's new voluntary Brady check policy, BCI&I would forward the Brady forms of those buyers not consenting to state record verification to the ATF for Brady checks.

At this time, appellants' counsel wrote the Attorney General, contending that the Attorney General and BCI&I never had the authority to conduct Brady checks or charge the Brady fee. On July 14, 1997, the Attorney General responded, asserting that the state agencies did have authority to conduct Brady checks: under the pre-*Printz* Brady check system, the Attorney General and BCI&I were the agreed-upon CLEO designee; since *Printz*, Ohio could implement a system of voluntary Brady checks through R.C. 109.57, which allowed records release and verification where the buyer signed a written consent form; where such a consent form was not signed, the Brady form would be sent to federal authorities. The Attorney General maintained that the Brady fees were

proper, as R.C. 109.57(E) allowed reasonable fees to be charged for records release and verification.

On July 29, 1997, the USAG opined in a letter to the Attorney General that Ohio law allowed BCI&I to conduct involuntary Brady checks. The Attorney General had Ohio's State Solicitor review the USAG's contention. On August 4, 1997, the State Solicitor responded, informing the Attorney General that he disagreed with the USAG's conclusion:

"The Brady Act, to be sure, initially compelled States to establish an interim system for conducting background checks on their citizens. Yet when the U.S. Supreme Court invalidated this provision of the [Brady] Act in *Printz* * * *, any requirement that [BCI&I] continue to conduct involuntary background checks fell with it.

"To suggest that the Brady Act nonetheless still 'authorizes' [BCI&I] to perform involuntary background checks represents an unhelpful play on words. Either the Brady Act *requires* Ohio to conduct such checks or it does not. It if does not, as is clearly true after *Printz*, it is no help to say that the federal government permits Ohio to continue to conduct such checks if authorized under Ohio law. That of course was as true before the Brady Act was enacted as after it—indeed, it is probably true about any conceivable legislative policy. In the last analysis, the only relevant question is whether Ohio law independently permits [BCI&I] to conduct such checks when there is no freestanding federal duty to do so."

The State Solicitor reviewed several relevant statutes that related to whether BCI&I had the power to conduct Brady checks of any form:

"[R.C. 109.54] no doubt gives [BCI&I] authority to 'investigate' any 'criminal activity' in the State at the request of local authorities and to 'aid federal authorities' in their 'investigation' of 'criminal activity.' * * * But there has been no showing that across-the-board checks tenably amount to a legitimate 'investigation' of 'criminal activity.' * * * Under these circumstances, it is hard to maintain that a check on every purchase constitutes an 'investigation' of 'criminal activity,' at least if those terms are going to continue to have any legitimate content.

"* * *

"Under Section 109.572, [BCI&I] may conduct checks upon receipt of certain information and in certain circumstances. Accordingly, in some instances, [BCI&I] may conduct the check only after it has received a proper form and fingerprints, *see* R.C. 109.572(A); and in others, [BCI&I] may conduct the check without the form and fingerprints if authorized by enumerated statutory provisions. *See* R.C. 109.572(B). But, importantly, every single one of the back-

ground checks enumerated in R.C. 109.572(B) relates to checks to determine the background of individuals for prospective employment in areas like child care or elderly adult care. The provision says not a word about authorizing involuntary background checks in other areas generally or in the context of handgun purchases specifically. * * * The legislature's conspicuous silence about permitting background checks for handgun purchasers, in short, is meaningful and should be respected.

"Still another statute confirms the danger to [BCI&I] of freely commanding Ohioans to submit to involuntary background checks. [R.C.] 109.57 confirms that the background check information collected by [BCI&I] may not be disclosed unless specifically authorized. It says that the confidential records are not 'public records' for purposes of [R.C.] 149.43, unless [BCI&I] is specifically authorized to conduct the background check in accordance with the above provisions. As a result, any non-specified release of the information would constitute a violation of [R.C.] 102.03, which prohibits the release of confidential information by State employees, and any non-specified check would constitute a violation of [R.C.] 109.541(C).

"* * *

"The critical problem with the [USAG's] argument is this: [BCI&I] is, and always has been, a creature of statute. As such, it possesses only those powers given to it by the Ohio General Assembly—more specifically, those set forth in section 109.541 to 109.65 of the Ohio Revised Code. Removing any room for doubt on this score, [R.C.] 109.541 codifies this limiting principle by providing that '[n]o state official shall command, order, or direct (a [BCI&I] employee) to perform any duty or service that is not authorized by law.' R.C. 109.541(C). [BCI&I], in short, needs statutory authorization before it may act, a no-nonsense statutory limit that notions of implied authority [advanced by the USAG] cannot circumvent.

"[BCI&I] likewise must respect all statutory limits on its powers. Quite simply, the agency may not bypass *express* statutory limits on its power through contentions that it has *implied* authority to do something else. Under these circumstances, the [USAG's] reliance on powers and functions of law enforcement officials implied from general grants of authority is misplaced. While there may be instances where law enforcement actions may be taken without specific statutory authorization, this simply is not one of them. In the end, the Ohio General Assembly has defined the instances when background checks my be conducted and has otherwise prohibited the distribution of background information; [BCI&I] officials simply may not take contrary action.

"* * *

"No more persuasive is the repeated suggestion in the [USAG's] letter that background checks are, or have become, a 'standard' and 'routine' law enforcement technique. Such a description ignores the long and arduous struggle to enact the federal Brady Act, the variance among states with and without Brady laws, and the public debate surrounding the implementation of such checks. But even assuming for sake of argument that the letter's characterization of Brady checks is correct, this is only relevant if some legislative authorization or mandate—whether state or federal—still authorizes the checks to be conducted. The frequency with which background checks are conducted does not alter the fundamental question."

The State Solicitor concluded:

"With respect to background checks, the General Assembly has specifically defined the circumstances under which [BCI&I] may conduct background checks, and has otherwise prohibited the dissemination of background information. Following the passage of the Brady Act in 1993, the General Assembly took no other action to expand this authority in order to implement Brady checks. Instead, [BCI&I] relied solely on the federal *requirement* to conduct such checks. In the absence of a federal mandate or the passage of an Ohio law authorizing involuntary background checks for handgun purchasers, [BCI&I] may not conduct them."

The Attorney General immediately conveyed these conclusions to the USAG, attaching the State Solicitor's memorandum. The Attorney General reiterated the earlier-made proposal:

"[T]here is a way to solve our background check dilemma and strengthen the Brady process. As we discussed last week, I write to propose a federal-state cooperative method for conducting background checks until the federal system is fully operational in 1998. Ohio intends to continue to conduct checks of consenting prospective handgun purchasers. Ohio also intends to continue to forward to the ATF all completed Brady Forms from all non-consenting prospective purchasers. In those instances where an individual has refused to provide a waiver for the background check, Ohio is willing to also forward to the ATF a portion of the fee paid by the purchaser and collected by [BCI&I]. Our hope is that these funds will allow ATF to cover the costs of employing the few additional staff necessary to conduct the checks of non-consenting Ohio purchasers. ATF employees can conduct the checks through access to the Interstate Identification Index (III), which offers ATF precisely the same access to Ohio records that [BCI&I] employees have. If there is a 'hit' by an Ohio handgun purchaser, ATF can notify [BCI&I] and [BCI&I] can then conduct a thorough review of all available criminal history information, that is, [BCI&I] will assist federal authori-

ties in the investigation of a criminal activity (a suspected illegal purchase)—an action specifically authorized by Ohio law.

"* * *

"I can assure you that we understand and sympathize with the desire of the Justice Department and Treasury Secretary Rubin for Ohio to conduct Brady checks. As I have told you from the time the *Printz* decision was announced, we would be willing to conduct such checks if Ohio law allowed us to do so. Nonetheless, in the absence of that authority, we remain hopeful that our offices can continue to work together to conduct checks within constitutional and statutory parameters."

The ongoing debate was further memorialized in a September 5, 1997 letter from the Attorney General to the federal Department of Justice Office of Intergovernmental Affairs:

"[W]ithin 72 hours of the [United States] Supreme Court's action [in *Printz* ], our office designed a system which allows background checks to be conducted for purchasers who give their consent. * * * Since Ohio law permits our [BCI&I] to conduct background checks upon consent, our solution provided a workable system that was consistent with the unique application of Ohio law. Since then, more than two-thirds of prospective handgun purchasers have given their consent to [BCI&I].

"* * *

"In [the Attorney General's letter of August 4, 1997, the] Attorney General * * * went on to propose a federal-state cooperative method for conducting background checks until the overall federal handgun system * * * is fully operational in 1998. * * * In those instances where an individual has refused to provide a waiver for the background check, Ohio would * * * forward to the ATF a significant portion of the fee paid by the purchaser and collected by BCI&I. I have indicated to you in the past that the amount of money forwarded to ATF would likely be in the range of $150,000–$200,000 per year—easily enough money to fund the two full-time ATF employees needed to conduct these checks.

"* * *

"On August 15, 1997, the United States Justice Department ('DOJ') responded [to the Attorney General's proposal] by offering a proposal whereby Ohio's [BCI&I] agents would be deputized as federal agents. These [BCI&I]/federal agents would then conduct Brady checks via Ohio's [BCI&I] system. In response, I explained that simply deputizing State [BCI&I] agents does not provide Ohio with authority to conducts [sic] checks that are not currently allowed under State law. In fact, permitting [BCI&I] agents to accept deputation for purposes

unrelated to an *investigation of criminal activity* would appear to violate the specific mandate of the Ohio General Assembly[.]

"* * *

"We continue to believe that forwarding to ATF the Brady Forms provided by non-consenting prospective purchasers, along with a fee adequate to cover ATF's costs to conduct the checks, is the best method for assuring that Brady background checks are conducted in Ohio." (Emphasis *sic*.)

The debate over how to conduct Brady checks continued, with Ohio continuing to offer its proposal. As aptly put by the trial court, "[a]s one can suspect, the ATF failed to cooperate." On February 4, 1998, the Superintendent wrote a letter to Ohio's FFLs:

"When the U.S. Supreme Court struck down a part of the Brady Act in June of 1997, the State of Ohio found itself in a unique situation. Ohio law permits criminal record information to be released for one of two reasons[:] first for criminal justice purposes, such as an ongoing investigation into suspected criminal conduct; and second, upon the individual authorizing their record to be checked as for pre-employment."

The Superintendent briefly described the Attorney General's proposal of voluntary Brady checks, continuing:

"It was later learned that ATF refused to conduct the checks and although over 90% of gun buyers were signing the waivers, [the] Attorney General * * * wanted to be as thorough as possible while following Ohio law. On December 22, 1997, an agreement was reached between [the] Attorney General * * *, the [DOJ], and the Franklin County Sheriff's Office ['Sheriff's Office']. Several members of the Sheriff's Office have been designated as federal agents for the purpose of conducting non-waiver Brady checks. This system will ensure that everyone who is required to have a Brady check is screened according to the federal requirement.

"As an FFL * * *, you should notice no difference in your current operation. You are still required to fill out the [Brady form] and contact BCI&I via the 900 phone number/fax number. If the buyer signs the waiver, you may transfer a weapon after two business days. If the buyer does not sign the waiver, you still need to contact BCI&I via the 900 number and BCI&I will then forward the information to [the Sheriff's Office], who will run the check and notify BCI&I of the results within five days. In the event of a denial, BCI&I will notify you within the five day period.

"This program will continue through November of 1998 when the FBI will take over the Brady check program. Please note that for people who consent to [the]

waiver, the approval time is two days, while non-waivers remain at five days. The $13 fee remains the same for either check."

This letter summarized the details of the Attorney General and federal authorities' agreement to ensure that Brady checks would continue in Ohio.

The agreement was formalized in a "Memorandum of Understanding" ("Memorandum") executed by the Attorney General, the USAG, and the United States Secretary of the Treasury. The Memorandum included provisions regarding the authority to conduct and the effectiveness of Brady checks:

"5. * * * Ohio law * * * empowers the * * * Attorney General and BCI&I to cooperate with federal and local law enforcement agencies in the investigation of criminal activity. *E.g.,* [R.C.] 109.52, 109.54, 109.62.

"6. Sheriffs also share in broad authority under Ohio law to protect the public from crime through prevention, detection, and investigation.

"* * *

"8. Cooperation among law enforcement agencies is particularly essential to combating violent crime and gun violence through enforcement of Federal and state laws governing firearm possession. In this regard, both Ohio and Federal law make acquisition or possession of firearms by certain categories of persons, such as convicted felons, a serious felony offense.

"* * *

"11. The Brady Act has proven effective in keeping guns out of the hands of criminals and others who should not have them. According to [DOJ] surveys, since the Brady Act became effective on February 28, 1994, the background checks of the kind provided for in the [Brady] Act have prevented over 250,000 persons nationwide, including convicted felons, fugitives from justice, individuals subject to domestic violence restraining orders and others in prohibited categories, from illegally obtaining firearms.

"12. In Ohio, the Brady Act likewise has made an important contribution to preventing firearms from being sold to criminals and other prohibited persons. As of January 1, 1997, background checks had blocked nearly 1,000 felons, fugitives and others from illegally obtaining firearms from [FFLs].

"13. In *Printz* * * *, the United States Supreme Court declared unconstitutional [two] provisions of the Brady Act * * *. However, the decision nevertheless recognized that law enforcement agencies with the authority to do so may voluntarily carry out the Brady Act's purposes by continuing to conduct * * * background checks. *Printz,* [521 U.S. at 934], 117 S.Ct. at 2384 [138 L.Ed.2d at 943–944] (majority opinion); *see also id.* at [936, 117 S.Ct. at] 2385 [138 L.Ed.2d at 945] (O'Connor, J., concurring)."

The memorandum then addressed the new voluntary Brady check system:

"15. The \* \* \* Attorney General has determined that, without the Federal mandate to conduct background checks, [the Attorney General] is prohibited from requiring a background check for certain prospective handgun purchasers because the requisite statutory authority is lacking. \* \* \* [I]n the interest of preventing crime, the \* \* \* Attorney General established a system for conducting background checks on those prospective handgun purchasers who consent in writing to such a check. Currently 90 percent of total handgun purchasers in Ohio are consenting to background checks performed by the \* \* \* Attorney General's Office. Further, Ohio law does not prohibit county sheriffs from performing background checks on prospective handgun purchasers to prevent crime and enforce Ohio law.

"\* \* \*

"17. For the reasons stated above, the [USAG], the Secretary of the Treasury, the Attorney General \* \* \*, the Franklin County Commissioners and the [Sheriff's Office], pursuant to their lawful authority, agree to and shall effectuate the following arrangements to implement a background check on every prospective handgun purchaser in Ohio.

"\* \* \*

"19. In the interests of advancing public safety and fulfilling the purposes of the Brady Act, \* \* \* the [DOJ] hereby authorizes the [Sheriff's Office] and any appropriate designee thereof \* \* \* to access the Federal NCIC and III databases for purposes of conducting background checks on prospective handgun purchasers who do not consent to a background check performed by the \* \* \* Attorney General.

"20. Until the National Instant Criminal Background Check System \* \* \* becomes operational on or before November 30, 1998, BCI&I shall \* \* \* conduct a background check on each prospective handgun purchaser who consents in writing to such a background check[.]

"21. With respect to any prospective handgun purchaser who refuses to consent in writing to a background check, BCI&I shall immediately forward a copy of the [Brady form] to the [Sheriff's Office].

"22. [T]he [Sheriff's Office] shall immediately perform a background check \* \* \* using all reasonable efforts and all reasonably available means, including, without limitation, the Federal NCIC and III and Ohio LEADS databases; provided, however \* \* \* the [Sheriff's Office] shall not seek access to criminal history records maintained solely in BCI&I databases.

"\* \* \*

"24. If the [Sheriff's Office] obtains information indicating that a prospective handgun purchaser may be disqualified by Federal or state law from purchasing or possessing a firearm, said Sheriff shall immediately notify BCI&I of this information * * *. Upon confirmation by the [Sheriff's Office] that the Brady Section at BCI&I has received such documentation, the [Sheriff's Office] shall then immediately return to BCI&I any documents still in [its] possession concerning the purchaser or the proposed firearms transaction.

"25. Upon notification from the [Sheriff's Office] * * * that a prospective handgun purchaser may be disqualified * * *, the Brady Section of BCI&I shall, using all reasonable efforts and all reasonably available means, including, without limitation, searches of BCI&I criminal history records, immediately conduct such further and additional investigation as necessary to determine whether the proposed firearms transaction may proceed lawfully under Federal or state law.

"26. * * * BCI&I agrees to maintain all of the documentation pertaining to a prohibited firearms transaction indefinitely consistent with the provisions of the Brady Act.

"27. Further, with respect to each proposed transaction for which BCI&I determines that transfer of a firearm to a prospective handgun purchaser would violate Federal law, BCI&I shall, as quickly as possible, make a reasonable effort to notify the [ATF] of the name, address, other identifying information, location of the attempted purchase, and any other information in its possession relevant to the possible Federal offense.

"28. It is expressly agreed and understood that BCI&I, the Franklin County Commissioners, and the [Sheriff's Office] may cease adherence to the terms of this Memorandum * * * at any time."

Background checks proceeded pursuant to this agreement until the Brady Act's sunset provision became effective, November 30, 1998. At that time, the Brady Act's permanent provision, Section 922(t), was activated.

6. Instant Proceedings

On January 12, 1999, appellants filed their instant complaint against Betty Montgomery, both in her official capacity as Attorney General and as an individual. Appellants alleged that the Attorney General had no legal authority to charge the Brady fees. They alleged that the Attorney General deprived handgun purchasers, as a class, of property without due process of law, contrary to the Fourteenth Amendment to the United States Constitution, and that the Brady fees were unlawful exactions. Appellants' class action claim for a refund of all Brady fees in Ohio was brought pursuant to Section 1983, Title 42, U.S.Code to redress their alleged deprivation of constitutional rights, privileges, and immunities under color of state law.

Appellants alleged that during the Brady Act's interim system, the Attorney General coerced handgun purchasers and FFLs into paying unlawful Brady fees by requiring FFLs to provide notice of the Brady form to BCI&I through a "900" number at an automatic charge of $15. Appellants alleged that after *Printz*, the Attorney General coerced FFLs into having prospective handgun purchasers execute a waiver for BCI&I to conduct Brady checks, or else have the background check done by federal authorities. Under either post-*Printz* scheme, a $13 Brady fee was charged, and appellants asserted that a failure to pay the Brady fee could not constitute a valid reason to disapprove a handgun transfer. Davis Guns alleged that it was required to make payments between 1994 and 1997 for transmitting Brady forms on behalf of handgun purchasers as promotional sales. Appellants sought repayment of Brady fees paid between February 28, 1994 and November 29, 1998.

The Attorney General answered, denying that BCI&I was itself a CLEO or that BCI&I was unauthorized to conduct Brady checks. The Attorney General admitted to instructing all Ohio FFLs to submit Brady forms to BCI&I. The Attorney General asserted authority to charge the Brady fee and to establish the "900" telephone number to facilitate Brady fee collection. The Attorney General asserted that after *Printz*, Brady checks were either done by BCI&I with the buyer's consent or by federalized sheriff's office deputies, and that the Brady fee charged for these checks was legal.

The trial court certified the class, and a class action notice was distributed. The parties filed extensive motions for summary judgment. On March 1, 2000, the trial court granted summary judgment to the Attorney General in a forty-one-page decision.

The trial court first considered whether the Attorney General qualified as a CLEO under Section 922(s)(8) during the interim Brady Act system. The trial court looked to R.C. 109.02 and the statewide notice sent by the OACP agreeing that the Attorney General was Ohio's primary CLEO. Based upon these authorities, the trial court concluded that the Attorney General properly acted as Ohio's CLEO.

The trial court then turned to whether Ohio law authorized the BCI&I to conduct involuntary Brady checks and to charge the Brady fee. The trial court engaged in a thorough discussion of relevant statutes delineating the powers of the BCI&I and the Superintendent: R.C. 109.51, 109.52, 109.55, and 109.57. The trial court found that, with regard to the release of any records maintained by the BCI&I, R.C. 109.57(E) allowed that a "reasonable fee may be charged for this service." The trial court concluded that the Attorney General had earlier adopted a procedure for requesting criminal records in Ohio Adm.Code 109:5–1–01, and that the Revised Code allowed charging a fee for voluntary records

releases. The trial court found that any person complying with the regulation was entitled to access to or a release of their records.

The trial court also considered the statutory duties imposed upon BCI&I, including its duty to cooperate with other law enforcement authorities in coordinating law enforcement work. R.C. 109.55. While Sections 922(s)(2) and (6) were in effect, BCI&I was "under a federal requirement to perform background checks prior to handgun transfers." The trial court concluded that although the Brady Act did not specifically establish a Brady fee, BCI&I was authorized by Ohio law to charge the fee.

The trial court then turned to the Attorney General's decision to implement a voluntary Brady check system after *Printz.* The voluntary "quick check" system was effective only for those individuals who executed a written waiver allowing a record check pursuant to R.C. 109.57. Even though after *Printz* there was no federal mandate to conduct Brady checks, BCI&I did have authority under Ohio law to conduct purely voluntary Brady checks.

The trial court determined that voluntary waivers were "an appropriate vehicle" by which BCI&I could perform Brady checks. The trial court found that this system did not violate the Second Amendment to the United States Constitution, as that Amendment has yet to be selectively incorporated as effective upon the states. The trial court further concluded that appellants failed to demonstrate that the Brady fees charged under R.C. 109.57(E) constituted an unconstitutional and impermissible taking of property without due process. Appellants appeal and present two assignments of error which we will consider in reverse order.

Assignment of Error No. 2:

"The court erred in holding this claim not actionable under 42 U.S.C. § 1983."

Issues Presented for Review:

"A. The court erred in relying on the possibility of post-deprivation procedures, because the deprivation was the predictable result of established state procedures.

"B. The court erred in holding that plaintiffs failed to state a claim for violation of due process.

"C. The court erred in not rejecting defendant's claim to immunity."

Appellants contend that the trial court erred in granting summary judgment to the Attorney General as to their Section 1983 claim. Appellants assert that the Brady check system and Brady fee infringed upon their rights and deprived them of property through an established state policy that did not provide a pre-deprivation state remedy.

## B. SUMMARY JUDGMENT

█ Pursuant to Civ.R. 56(C), the trial court may grant summary judgment where there is no genuine issue as to any material fact. *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 346, 617 N.E.2d 1129, 1131–1132. Summary judgment will be granted if reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is made. *Id.* An issue of fact exists when the relevant factual allegations in the pleadings, affidavits, depositions, or interrogatories are in conflict. *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140, 1144.

In deciding whether there is a genuine issue of material fact, the evidence must be construed in the nonmoving party's favor, and "the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion." *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485, 696 N.E.2d 1044, 1046, citing *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123, 1126–1127. Summary judgment is appropriate where a plaintiff fails to produce evidence supporting the essential elements of his claim. *Welco Industries,* 67 Ohio St.3d at 346, 617 N.E.2d at 1131–1132.

█ In determining whether the plaintiff demonstrated the elements of his claim, an appellate court must independently review the record to determine if summary judgment was appropriate. Therefore, an appellate court affords no deference to the trial court's decision when making its own decision. *Beardsley v. Manfredi Motor Transit Co.* (1994), 97 Ohio App.3d 768, 769, 647 N.E.2d 555, 556.

## C. SECTION 1983 CLAIM

### 1. Jurisdiction

█ We first address an issue of jurisdiction raised in the pleadings, but left unresolved by the trial court: whether appellants' cause of action was required to have been initiated in the Ohio Court of Claims, pursuant to R.C. 2743.02.[15] In

---

**15.** The Court of Claims Act, R.C. 2743.02, provides:

"(A)(1) The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties * * *.
"* * *
"(E) The only defendant in original actions in the court of claims is the state. * * *
"(F) A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of his employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against

*Conley v. Shearer* (1992), 64 Ohio St.3d 284, 595 N.E.2d 862, the Supreme Court ruled that R.C. 2743.02, which requires that suits against the state or its officers and employees must be instituted in the Court of Claims, is not applicable to Section 1983 claims because such suits are founded in federal, not state, law. *Id.* at 293, 595 N.E.2d at 869–870, citing *Schwarz v. Ohio State Univ. Bd. of Trustees* (1987), 31 Ohio St.3d 267, 31 OBR 493, 510 N.E.2d 808, paragraph two of the syllabus. Thus, the trial court did have jurisdiction over appellants' Section 1983 claim.

2. Statute of Limitations

The Attorney General pled and argued in summary judgment that appellants' Section 1983 claim was barred by the statute of limitations. The trial court did not decide this issue due to its resolution of the case on other grounds.

The Reconstruction Civil Rights Acts, of which Section 1983 is a progeny, do not contain an explicit statute of limitations, " 'a void which is commonplace in federal statutory law.' " *Wilson v. Garcia* (1985), 471 U.S. 261, 266, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254, 260. For that reason, the United States Supreme Court has looked to practical considerations to conclude that Section 1983 actions confer "a general remedy for injuries to personal rights." *Id.* at 278, 105 S.Ct. at 1948, 85 L.Ed.2d at 268. "[Section] 1983 claims are best characterized as personal injury actions" subject to the state "statute of limitations governing actions 'for an injury to the person or reputation of any person.' " *Id.* at 280, 105 S.Ct. at 1949, 85 L.Ed.2d at 269.

*Wilson* cleared some confusion regarding the statute of limitations applicable to Section 1983 claims, but it left unresolved what happened if a state had more than one personal injury statute of limitations. This circumstance was resolved in *Owens v. Okure* (1989), 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594. There the court rejected an argument that the statute of limitations for intentional torts governs Section 1983 actions. The court reasoned that Section 1983 claims take many forms without state law analogy, and comparing them to intentional tort claims "would be inconsistent with [Section] 1983's broad scope." *Id.* at 249, 109 S.Ct. at 581, 102 L.Ed.2d at 605. The court held that "where state law provides multiple statutes of limitations for personal injury actions, courts considering [Section] 1983 claims should borrow the general or residual statute for personal injury actions." *Id.* at 249–250, 109 S.Ct. at 582, 102 L.Ed.2d at 606.

---

the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

This court addressed the effect of *Okure* in *State ex rel. Eckstein v. Midwest Pride IV, Inc.* (1998), 128 Ohio App.3d 1, 713 N.E.2d 1055, wherein we reasoned:

"R.C. 2305.09(D) contains a residual statute of limitations; however, it is apparent to this court that R.C. 2305.10 contains the general statute of limitations for personal injury actions. Therefore, we find that the appropriate limitations period to be applied in a Section 1983 action is the two-year period set forth in R.C. 2305.10." *Id.* at 14, 713 N.E.2d at 1063.

*Midwest Pride IV* accorded with the federal courts and other Ohio appellate courts. See *id.* at 13–14, 713 N.E.2d at 1062–1064. Although some Ohio appellate courts have disagreed, finding that the four-year limitations period in R.C. 2305.09(D) governs Section 1983 actions, see *id.* at 14, 713 N.E.2d at 1063–1064, the reasoning of these other cases remains unpersuasive in light of the clear mandate of *Wilson* and *Okure* and the text of relevant statutes.

*Wilson* and *Okure* make clear that although not strictly personal injury claims, Section 1983 actions are most analogous to personal injury suits. *Okure,* 488 U.S. at 249–250, 109 S.Ct. at 581–582, 102 L.Ed.2d at 605–606; *Wilson,* 471 U.S. at 278 and 280, 105 S.Ct. at 1948 and 1949, 85 L.Ed.2d at 267–268 and 269.

R.C. 2305.09 provides:

"An action for any of the following causes shall be brought within four years after the cause thereof accrued:

"* * *

"(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12, 2305.14[,] and 1304.35 of the Revised Code."

R.C. 2305.10 states:

"(A) Except as provided in division (C) of this section [as to product liability claims], an action based on a product liability claim and an action for bodily injury or injuring personal property shall be brought within two years after the cause of action accrues. Except as provided in divisions (B)(1) to (4) of this section, a cause of action accrues under this division when the injury or loss to person or property occurs."

■ R.C. 2305.09 applies to certain enumerated causes of action. It specifically excepts those claims governed by R.C. 2305.10, which include. actions "for bodily injury." Thus, the general personal injury limitations period is two years, as included in R.C. 2305.10. See *Browning v. Burt* (1993), 66 Ohio St.3d 544, 558, 613 N.E.2d 993, certiorari denied (1994), 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375; *Gambill v. Bonded Oil Co.* (1990), 52 Ohio St.3d 90, 556 N.E.2d 177,

syllabus; *Richardson v. Doe* (1964), 176 Ohio St. 370, 373, 27 O.O.2d 345, 347, 199 N.E.2d 878, 880, and syllabus.

This conclusion is borne out by cases interpreting former Section 11224–1, General Code, which was nearly identical to R.C. 2305.10. That provision stated:

"An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose."

Section 11224–1, General Code, governed "all actions the real purpose of which is to recover damages for injury to the person and losses incident thereto and it makes no difference whether such action is for a breach of contract or strictly in tort. The limitation is imposed on the cause of action and the form in which the action is brought is immaterial." *Andrianos v. Community Traction Co.* (1951), 155 Ohio St. 47, 44 O.O. 72, 97 N.E.2d 549, paragraph two of the syllabus.

The section was "not confined to any particular type of injury, nor does it concern itself with the circumstances under which an injury was inflicted. On its face, it clearly covers all actions based on a claim respecting bodily injury." *Id.* at 51, 44 O.O. at 74, 97 N.E.2d at 552. The modern version of the limitations statutes are more detailed and specific, see R.C. 2305.09(A) to (C) and 2305.11, but the effect of R.C. 2305.10(A) is the same as was that of Section 11224–1, General Code: all personal injury actions, except those specifically governed by another statute, are subject to a two-year limitations period.

Cases finding R.C. 2305.09(D) applicable to Section 1983 actions misread the import of the limitations statutes, hinging their analysis upon R.C. 2305.09(D)'s inclusion of the words "injury to the rights of the plaintiff." See *Bojac Corp. v. Kutevac* (1990), 64 Ohio App.3d 368, 370–371, 581 N.E.2d 625; *Weethee v. Boso* (1989), 64 Ohio App.3d 532, 534–535, 582 N.E.2d 19.[16] But these words must be read in light of the full text of subsection (D): "an injury to the rights of the plaintiff not arising on contract *nor enumerated in sectio[n] 2305.10.*" (Emphasis added.) Personal injury claims subject to R.C. 2305.10 are thus exempt from R.C. 2305.09's application.

■ *Wilson* and *Okure* held that Section 1983 claims are best characterized as personal injury actions. Bodily injury, or personal injury, actions are specifically governed by R.C. 2305.10. See *Browning,* 66 Ohio St.3d at 558, 613 N.E.2d at 1004; *Gambill* at syllabus; *Richardson* at syllabus and 176 Ohio St. at 373, 27 O.O.2d at 347, 199 N.E.2d at 880. Thus, we reaffirm our holding in *Midwest*

---

**16.** But, see, *Herdman v. Capretta* (Dec. 17, 1996), Franklin App. No. 96APE05–864, unreported, 1996 WL 729858, at *3, which contradicts *Weethee* by concluding that the two-year statute of limitations in R.C. 2305.10(A) is applicable to Section 1983 claims. It should be noted, though, that *Herdman* does not even cite *Weethee,* and thus does not expressly overrule *Weethee.*

*Pride IV* that R.C. 2305.10(A), the two-year general personal injury limitations period, governs Section 1983 actions.

■ Appellants filed their complaint on January 12, 1999. But the initial decision about which they complain—the Attorney General's decision to charge the Brady fee—was made in 1994. Any complaint attacking the 1994 decision had to be filed in 1996. Appellants did not so file their complaint, and they are statutorily barred from challenging the 1994 decision directly.[17]

■ Appellants did file their complaint within two years of the 1997 decision by Betty Montgomery to continue to charge the Brady fee. Their complaint was timely as to that 1997 decision. Further, appellants' complaint could be construed to state a cause of action as to the effect of the 1994 decision: each time a class member was charged the Brady fee prior to *Printz* could be construed to constitute a possible deprivation of that individual's rights. Thus, those Brady fees charged under the pre-*Printz* Brady system on or after January 12, 1997 are not time-barred.

Any relief relating to events occurring prior to January 12, 1997 is barred by the two-year statute of limitations in R.C. 2305.10(A). The trial court's grant of summary judgment as to all events occurring before January 12, 1997 was proper.

3. Personal– and Official–Capacity Claims

Appellants sued Betty Montgomery in both her official capacity as Attorney General and in her personal capacity. In their personal-capacity claim, appellants allege that Betty Montgomery, although acting in her official capacity, is personally liable for violating appellants' civil rights when ordering the Brady fee to be charged. The official-capacity claim is premised upon the same principle: that the Attorney General's office acted improperly when charging the Brady fee. But the official-capacity suit seeks to hold the Office of the Attorney General, and thus the state, liable for the alleged illegal conduct. Because there is a distinction between personal-capacity and official-capacity suits, appellants' ability to maintain these claims must be reviewed.

■ Personal-capacity suits, sometimes characterized as individual-capacity suits, seek to impose individual liability upon a government officer for actions taken under color of state law. *Hafer v. Melo* (1991), 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301, 309–310. By contrast, an official-capacity suit, wherein

---

**17.** Additionally, Betty Montgomery was not acting as Attorney General at the time of the 1994 decision to charge the Brady fee. Her predecessor, Lee Fisher, was still in office at that time. Even had appellants filed their complaint within the limitations period, they failed to name the proper individual defendant as to the 1994 decision.

a government officer is sued in her official capacity, " 'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.' " *Id.*, quoting *Kentucky v. Graham* (1985), 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121. For this reason, official-capacity suits are treated as suits against the state itself. *Id.* at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 121–122.

■ The distinction between personal-capacity and official-capacity suits is important due to the test of Section 1983 providing that "[e]very *person* who, under color of any * * * [law], custom, or usage, of any State"[18] deprives citizens of their rights, privileges, or immunities under the federal Constitution or law is liable to the injured citizens. Only a "person" is subject to liability under Section 1983. Section 1983 is inapplicable against a state, as "a State is not a person within the meaning of [Section] 1983." *Will v. Michigan Dept. of State Police* (1989), 491 U.S. 58, 64, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45, 53. The United States Supreme Court reached this conclusion through a lengthy review of Section 1983's text and legislative history. See *id.* at 64–69, 109 S.Ct. at 2308–2311, 105 L.Ed.2d at 53–57.[19]

■ When a state official is sued in her official capacity, the suit is actually one against the official's office, which is akin to a suit against the state. Thus, Section 1983 may not be the basis for·an official-capacity suit for money damages, as the official, acting in her official capacity, is not a "person" within the ambit of Section 1983. *Hafer*, 502 U.S. at 26, 112 S.Ct. at 362, 116 L.Ed.2d at 310; *Will*, 491 U.S. at 70–71, 109 S.Ct. at 2312, 105 L.Ed.2d at 57–58; *Burkey v. S. Ohio Corr. Facility* (1988), 38 Ohio App.3d 170, 171, 528 N.E.2d 607, 608. This is because "while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Graham*, 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 121; see *Schwarz*, 31 Ohio St.3d at 273, 31 OBR at 499, 510 N.E.2d at 813: "university officials * * * are not 'the state,' * * * and such will usually be the case unless the state is the real party in interest and a judgment for the plaintiff could operate to control the action of the state or subject it to liability."

---

**18.** Emphasis added.

**19.** This contrasts with the rule for municipalities, which are "persons" subject to Section 1983 and to *respondeat superior* liability for the acts of their employees. *Monell v. New York City Dept. of Social Serv.* (1978), 436 U.S. 658, 701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611, 641–642. As the court later explained, by the time of Section 1983's enactment, municipalities had largely lost the sovereign immunity they had previously enjoyed. *Owen v. Independence* (1980), 445 U.S. 622, 646–647, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673, 690–691, rehearing denied (1980), 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850.

Thus, a Section 1983 claim for monetary relief may be brought against a state official only in that official's individual capacity.

There is one exception to the rule that a state and its officials in their official capacity are not "persons" within the meaning of Section 1983. When only prospective relief is sought, the state and its officials are "persons" within Section 1983's ambit. *Will*, 491 U.S. at 71, 109 S.Ct. at 2312, 105 L.Ed.2d at 58, fn. 10; *Schwarz*, 31 Ohio St.3d at 272–273, 31 OBR at 497–499, 510 N.E.2d at 812–813; *Racing Guild of Ohio, Local 304 v. State Racing Comm.* (1986), 28 Ohio St.3d 317, 28 OBR 386, 503 N.E.2d 1025, paragraph one of the syllabus. Such actions are not treated as against the state. *Graham*, 473 U.S. at 167, 105 S.Ct. at 3106, 87 L.Ed.2d at 122, fn. 14. With prospective relief, such as an injunction preventing future enforcement of a law, "no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer." *Ex parte Young* (1908), 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714, 729.

"The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity." *Id.*, 209 U.S. at 159, 28 S.Ct. at 454, 52 L.Ed. at 729. Prospective relief has only an ancillary effect upon the state coffers. *Thomson v. Harmony* (C.A.6, 1995), 65 F.3d 1314, 1320–1321, certiorari denied (1996), 517 U.S. 1105, 116 S.Ct. 1321, 134 L.Ed.2d 473.

Appellants allege that their suit, although requesting only monetary relief, is really an action for prospective, equitable relief. In their arguments/memoranda to the trial court, appellants attempted to analogize their Section 1983 claim to suits seeking payment of back pay for discrimination under federal law, citing *Head v. Timken Roller Bearing Co.* (C.A.6, 1973), 486 F.2d 870, and *Robinson v. Lorillard Corp.* (C.A.4, 1971), 444 F.2d 791, certiorari dismissed (1971), 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655. Those cases involved suits against *private* employers, and Section 2000e–5(g), Title 42, U.S.Code, which gives courts the express power to award backpay to successful employment discrimination claimants. Neither circumstance is present in appellants' claim, making these cases inapplicable. Other cases cited by appellants, *Grandview Raceway, Inc. v. Ohio State Racing Comm.* (1966), 6 Ohio App.2d 91, 35 O.O.2d 186, 216 N.E.2d 765, *Thrope v. Ohio* (S.D.Ohio 1997), 173 F.R.D. 483, and *Roman v. Korson* (W.D.Mich.1993), 152 F.R.D. 101, were suits for injunctive relief against government officials; again, relief appellants are not seeking.

Appellants nonetheless claim they are seeking prospective equitable relief because their Section 1983 claim attempts to refund the allegedly illegal Brady fee. "Prospective" is defined as

"1. Effective or operative in the future <prospective application of the new statute>. * * *

"2. Anticipated or expected; likely to come about <prospective clients>." Black's Law Dictionary (7 Ed.1999) 1238.

Prospective relief, by its very definition, would require a remedy preventing future conduct by the state. Appellants do not seek future relief, such as an injunction preventing future Brady checks or Brady fees.[20] Although the second count of appellants' complaint, founded in assumpsit and alleging that the Brady fee was illegal, may have some equitable characteristics, see *Ohio Hosp. Assn. v. Ohio Dept. of Human Serv.* (1991), 62 Ohio St.3d 97, 579 N.E.2d 695, paragraph three of the syllabus, certiorari denied (1992), 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625, the first count of appellants' complaint, their Section 1983 claim, seeks monetary relief for alleged *past* violations of their civil rights.

Appellants' Section 1983 claim for a refund of the Brady fees is not one for prospective, injunctive relief. It seeks only alleged past damages. Thus, appellants have no basis for an official-capacity suit. Summary judgment was properly granted to the Attorney General's Office as to appellants' official-capacity claim. This leaves only appellants' claim against Betty Montgomery in her individual capacity.

4. Recapitulation

To summarize to this point, the trial court had jurisdiction over appellants' Section 1983 suit. Due to appellants' failure to file their complaint within the applicable statute of limitations, all claims founded upon events prior to January 12, 1997 are time-barred. For purposes of convenience, each time the BCI&I charged the Brady fee after January 12, 1997 is considered a possible infringement of a class member's rights. Appellants did not state an official-capacity claim against the Attorney General because appellants did not seek prospective relief. The trial court properly granted summary judgment with regard to all events preceding January 12, 1997, and with regard to appellants' official-capacity suit.

5. Merits of Section 1983 Claim

a. Generally

---

**20.** Such relief would be impossible to grant. When the permanent federal background check system was implemented in November 1998, the federal government undertook the responsibility of conducting Brady checks. Ohio is no longer involved in the Brady system.

Civil rights actions have produced substantial litigation, and the law underlying Section 1983 claims is more than a little complex. Section 1 of the Civil Rights Act of 1871, as amended into current Section 1983, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

▆▆ To be entitled to relief under Section 1983, aggrieved parties must establish that "[1] they were deprived of a right secured by the Constitution or laws of the United States, and [2] that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan* (1999), 526 U.S. 40, 49–50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130, 142–144. Section 1983 was intended "not only to 'override' discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights 'where state law was inadequate,' but also to provide a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'" *Zinermon v. Burch* (1990), 494 U.S. 113, 124, 110 S.Ct. 975, 982, 108 L.Ed.2d 100, 113, quoting *Monroe v. Pape* (1961), 365 U.S. 167, 173–174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492, 497–498.

This suit involves two classes of aggrieved parties. First, buyers contend that the Attorney General infringed upon their rights to bear arms and to receive a handgun by conditioning those rights upon the payment of the allegedly unlawful Brady fee. Second, FFLs and buyers contend that the Brady fee deprived them of property, namely the amount of the fee, without due process of law.

b. Deprivation of Rights

i. Generally

▆▆▆ The first element of a Section 1983 claim is an alleged deprivation of rights. *Sullivan*, 526 U.S. at 49, 119 S.Ct. at 985, 143 L.Ed.2d at 142–143. Section 1983 " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver* (1994), 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114, 122, rehearing denied (1994), 510 U.S. 1215, 114 S.Ct. 1340, 127 L.Ed.2d 688, quoting *Baker v. McCollan* (1979), 443 U.S. 137, 144, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433, 442, fn. 3. The first step in any rights inquiry under Section 1983 is to "identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271, 114 S.Ct. at 811, 127 L.Ed.2d at 122. Three types of Section 1983 claims founded upon the Due Process Clause of the Fourteenth Amendment to the United States Constitution may be brought against state officials.

First, substantive rights may be enforced via Section 1983. "[T]he [Due Process] Clause incorporates many of the specific protections defined in the Bill of Rights," and a plaintiff may sue for an infringement of these specific rights. *Zinermon*, 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 113.[21] The Due Process Clause also "contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' " *Id.*, quoting *Daniels.v. Williams* (1986), 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668. Substantive due process thus protects both explicit rights and other fundamental rights.

In a substantive rights claim, the actionable constitutional violation is complete when the wrongful conduct takes place. *Zinermon*, 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 113–114. A plaintiff may invoke Section 1983 regardless of any state tort remedies that may compensate for the deprivation. *Id.* But "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Albright*, 510 U.S. at 273, 114 S.Ct. at 813, 127 L.Ed.2d at 123–124, quoting *Graham v. Connor* (1989), 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443, 454–455.

---

**21.** The incorporated provisions are: First Amendment, freedom of speech, *Fiske v. Kansas* (1927), 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108, freedom of the press, *Near v. Minnesota* (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, freedom of assembly, *De Jonge v. Oregon* (1937), 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278, right to petition, *Hague v. Commt. for Indus. Org.* (1939), 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, free exercise of religion, *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, and Establishment Clause, *Everson v. Bd. of Edn.* (1947), 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, rehearing denied (1947), 330 U.S. 855, 67 S.Ct. 962, 91 L.Ed. 1297; Fourth Amendment, protection against unreasonable searches and seizures, *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, rehearing denied (1961), 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72; Fifth Amendment, prohibitions on double jeopardy, *Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707, and self-incrimination, *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, and the Takings Clause, *First English Evangelical Lutheran Church v. Los Angeles* (1987), 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250; Sixth Amendment, rights to a speedy trial, *Klopfer v. North Carolina* (1967), 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1, a jury trial, *Duncan v. Louisiana* (1968), 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491, rehearing denied (1968), 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412, a public trial, *In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682, an impartial jury, *Irvin v. Dowd* (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, notice of charges, *Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682, confront witnesses, *Pointer v. Texas* (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, compulsory process, *Washington v. Texas* (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019, and counsel, *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Eighth Amendment, protection against cruel and unusual punishment, *Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, and excessive bail, *Schilb v. Kuebel* (1972), 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502, rehearing denied (1972), 405 U.S. 948, 92 S.Ct. 930, 30 L.Ed.2d 818.

■ The second Section 1983 claim enforces a federal statutory right. A federal statutory right claim may be maintained only where the federal statute at issue clearly provides an enforceable right. *Maine v. Thiboutot* (1980), 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555, 559.

■ The final Section 1983 Due Process Clause claim is founded upon the guarantee of fair procedure. A violation of procedural due process occurs where "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" (Emphasis *sic.*) *Zinermon,* 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 114; see *Carey v. Piphus* (1978), 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252, 262. A procedural due process violation is actionable not when the deprivation occurs, but only "unless and until the State fails to provide due process." *Zinermon,* 494 U.S. at 126, 110 S.Ct. at 983, 108 L.Ed.2d at 114. The existence of state remedies is relevant, for the court must examine "the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.*

ii. Substantive Due Process

(A) Violation of a Constitutional Right—Buyers

Buyers contend that the Brady scheme and Brady fee infringed upon the protections of the Second Amendment to the United States Constitution. That Amendment provides:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

It is long-settled law that, as to "bearing arms for a lawful purpose":

"This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its exercise. The [S]econd [A]mendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes, to what is called * * * the 'powers which relate to merely municipal legislation, or what was, perhaps, more properly called internal police,' 'not surrendered or restrained' by the Constitution of the United States." (Citation omitted.) *United States v. Cruikshank* (1875), 92 U.S. 542, 553, 23 L.Ed. 588, 591, 592.

It was later reiterated "that the amendment is a limitation only upon the power of Congress and the [n]ational government, and not upon that of the States."

*Presser v. Illinois* (1886), 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615, 619. The United States Supreme Court reaffirmed this principle in *United States v. Miller* (1939), 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206.

In *Miller*, the court found that a challenged state law that limited the possession of certain weapons did not run afoul of the Second Amendment because "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178, 59 S.Ct. at 818, 83 L.Ed. at 1209. The court determined that the Second Amendment was intended to be effective only upon the federal government, *id.*,[22] but "[m]ost if not all of the States have adopted * * * the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed." *Id.* at 182, 59 S.Ct. at 820, 83 L.Ed. at 1211.[23] As a result, the Due Process Clause of the Fourteenth Amendment does not incorporate the Second Amendment to restrict the power of the states to regulate the right to keep and bear arms. *Peoples Rights Org. v. Columbus* (C.A.6, 1998), 152 F.3d 522, 538, fn. 18; *Hickman v. Block* (C.A.9, 1996), 81 F.3d 98, 100–101, certiorari denied (1996), 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199; *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 41, 616 N.E.2d 163, 167–168.[24] Thus, there is

22. As stated by the Ohio Supreme Court:

"The vast majority of decisions which have considered the Second Amendment convey that this amendment is applicable to the federal government. These decisions signify, and history supports the position, that the amendment was drafted not with the primary purpose of guaranteeing the rights of individuals to keep and bear arms but, rather, to allow Americans to possess arms to ensure the preservation of a militia." (Footnote omitted.) *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 41, 616 N.E.2d 163, 167–168.

23. The disparity in state regulation has been described as follows:

"There seems to be two separate views, on the 'collective' versus 'individual' concept [of the right to bear arms], among state courts which have interpreted *their* constitutional provisions regarding the right to bear arms. Some courts have found that the safeguard is a collective right [possessed only by the state]. These courts have taken a stance advocating more restrictive gun control legislation. Other courts have emphasized that the right to bear arms extends to individuals. These courts disdain overly restrictive gun control legislation." (Emphasis *sic*.) (Citation omitted.) *Arnold*, 67 Ohio St.3d at 41, 616 N.E.2d at 168, fn. 7.

24. The federal circuit courts addressing the merits of the protections provided by the Second Amendment have uniformly stated, following *Miller*, "It is clear that the Second Amendment guarantees a collective rather than an individual right." As the amendment only guarantees "the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this right is infringed." *Hickman*, 81 F.3d at 102; *United States v. Warin* (C.A.6, 1976), 530 F.2d 103, 106, certiorari denied (1976), 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185; *United States v. Hale* (C.A.8, 1992), 978 F.2d 1016, 1020, certiorari denied (1993), 507 U.S. 997, 113 S.Ct. 1613, 123 L.Ed.2d 174; *Thomas v. Members of City Council of Portland* (C.A.1, 1984), 730 F.2d 41, 42; *United States v. Johnson* (C.A.4, 1974), 497 F.2d 548, 550. See, also, *Kellogg v. Gary* (Ind.1990), 562 N.E.2d 685, 692; *People v. Morrill* (1984), 101 A.D.2d 927, 475 N.Y.S.2d 648, 649; *In re Atkinson* (Minn.1980), 291 N.W.2d 396, 398, fn. 1.

no express, incorporated constitutional right upon which buyers may base their Section 1983 claim.

(B) Violation of Other Fundamental Rights—Buyers

 The basic protection of substantive due process as to other fundamental rights is "intended to secure the individual from the arbitrary exercise of the powers of government." *Albright,* 510 U.S. at 272, 114 S.Ct. at 812, 127 L.Ed.2d at 123. Violation of this branch of substantive due process occurs where there is government action infringing a fundamental right or which "shocks the conscience." *Mansfield Apt. Owners Assn. v. Mansfield* (C.A.6, 1993), 988 F.2d 1469, 1474.[25] The protection of substantive due process exists to ensure " 'the right to be free [from] state intrusions into [the] realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience.' " *Lillard v. Shelby Cty. Bd. of Edn.* (C.A.6, 1996), 76 F.3d 716, 725. The courts are hesitant to extend the scope of substantive due process:

" 'As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.' " *Albright,* 510 U.S. at 271–272, 114 S.Ct. at 812, 127 L.Ed.2d at 122, quoting *Collins v. Harker Hts.* (1992), 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273.

Substantive due process protections have been afforded only in certain fundamental realms, relating to "marriage, family, procreation, and the right to bodily integrity." *Albright,* 510 U.S. at 272, 114 S.Ct. at 812, 127 L.Ed.2d at 122.

 Buyers' claim is not based upon one of the recognized matters protected by substantive due process. Thus, buyers failed to provide a substantive due process ground for their suit.

Nor did buyers provide evidence showing that the Attorney General's conduct in authorizing the Brady fee "shocks the conscience." The lengthy correspondence in the record demonstrates that the Attorney General was very concerned about her authority to implement the Brady Act. The Attorney General was conscientious of the right of Ohioans. The Attorney General acted to address issues of handgun violence, issues which were recognized as being in the public interest. Under these circumstances, charging a minimal fee as part of the Brady check scheme cannot be said to shock the conscience. Buyers failed to demonstrate a fundamental rights violation to support their Section 1983 claim.

---

25. Although the Supreme Court has never limited the applicability of the "shocks the conscience" standard, some courts have doubted its vitality outside the realm of use of excessive force by law enforcement officials. See *Braley v. Pontiac* (C.A.6, 1990), 906 F.2d 220, 226.

iii. Federal Statutory Right—Buyers

Buyers contend that the Attorney General abridged their right to receive a handgun by imposing certain conditions not otherwise part of the Brady Act. Buyers argue that the Brady Act created a right to receive a handgun that could not be conditioned upon payment of the Brady fee.

(A) Generally

Section 1983 prohibits conduct abridging a federal statutory right—a matter distinct from violations of federal law, which are not actionable under Section 1983. *Blessing v. Freestone* (1997), 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569, 581–582, citing *Golden State Transit Corp. v. Los Angeles* (1989), 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420, 427. The essential inquiry in this regard is to determine whether the federal statute at issue creates a recognizable right that the plaintiff may defend or enforce. Three factors are examined to determine if a particular statutory provision gives rise to a right:

"First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." (Citations omitted.) *Blessing*, 520 U.S. at 340–341, 117 S.Ct. at 1359, 137 L.Ed.2d at 582; see *Pennhurst State School & Hosp. v. Halderman* (1981), 451 U.S. 1, 17–18, 101 S.Ct. 1531, 1539–1540, 67 L.Ed.2d 694, 707–708.

A statutory provision is mandatory, creating binding obligations upon a governmental unit, if it does more than "express a congressional preference for certain kinds of treatment." *Golden State Transit Corp.*, 493 U.S. at 106, 110 S.Ct. at 448, 107 L.Ed.2d at 428. As noted in *Blessing*, "[i]n prior cases, we have been able to determine whether or not a statute created a given right because plaintiffs articulated, and lower courts evaluated, well-defined claims." 520 U.S. at 342, 117 S.Ct. at 1360, 137 L.Ed.2d at 583. A court must take "pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created 'enforceable rights, privileges, or immunities within the meaning of [Section] 1983.'" *Suter v. Artist M.* (1992), 503 U.S. 347, 357, 112 S.Ct. 1360, 1367, 118 L.Ed.2d 1, 12, quoting *Wright v. Roanoke Redevelopment & Hous. Auth.* (1987), 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781, 788.[26]

---

**26.** As more fully described by one lower court:

Even should a plaintiff prove that a federal statute creates a specific right, "there is only a rebuttable presumption that the right is enforceable under [Section] 1983." *Blessing*, 520 U.S. at 341, 117 S.Ct. at 1360, 137 L.Ed.2d at 582. Dismissal of the cause is warranted where "Congress 'specifically foreclosed a remedy under [Section] 1983.'" *Id.*, quoting *Smith v. Robinson* (1984), 468 U.S. 992, 1004, 104 S.Ct. 3457, 3464, 82 L.Ed.2d 746, 760, fn. 9. Congress may effect such a result in two manners: first, "expressly, by forbidding recourse to [Section] 1983 in the statute itself," or second, "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under [Section] 1983." *Blessing*, 520 U.S. at 341, 117 S.Ct. at 1360, 137 L.Ed.2d at 582, citing *Livadas v. Bradshaw* (1994), 512 U.S. 107, 133, 114 S.Ct. 2068, 2083, 129 L.Ed.2d 93, 115–116. Such an enforcement scheme must be " 'sufficiently comprehensive * * * to demonstrate congressional intent to preclude the remedy of suits under [Section] 1983.'" *Wilder v. Virginia Hosp. Assn.* (1990), 496 U.S. 498, 521, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455, 474, quoting *Middlesex Cty. Sewerage Auth. v. Natl. Sea Clammers Assn.* (1981), 453 U.S. 1, 20, 101 S.Ct. 2615, 2626–2627, 69 L.Ed.2d 435, 450.[27]

Courts should not lightly conclude that a remedial scheme is so comprehensive as to supplant recourse to Section 1983. *Golden State Transit Corp.*, 493 U.S. at 107, 110 S.Ct. at 449, 107 L.Ed.2d at 428. In *Sea Clammers*, the Federal Water Pollution Control Act gave the Environmental Protection Agency a panoply of enforcement options and several of the Act's provisions authorized private citizen enforcement actions, making it "hard to believe that Congress intended to preserve the [Section] 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions." 453 U.S. at 13–14 and 20, 101 S.Ct. at 2622–2623 and 2626–2627, 69 L.Ed.2d at 446–447 and 451.

---

"*Pennhurst*, it seems, attempts to distinguish statutory provisions that announce broad policy goals or general preferences from those that dictate specifically what the relevant governmental officials may and may not do. While policy goals and general preferences leave much room for governmental officials to determine the means by which these goals and preferences are to be carried out, and therefore are ambiguous regarding what duties are owed to which citizens, specific language of obligation narrowly cabins the discretion of officials, and, by the same terms, secures rights to a specific class of people. * * *

"Indeed, the courts of appeals in the aftermath of *Pennhurst* have, for the most part, upheld rights claims in statutes that dictate specific action and leave little room for choice, while rejecting rights claims in statutes that merely indicate broad preferences." *Edwards v. Dist. of Columbia* (C.A.D.C.1987), 821 F.2d 651, 656.

27. One federal circuit court aptly stated that this inquiry requires a determination whether "the nature of the relief sought by plaintiffs here would cause a federal court to carry out an oversight function beyond that intended by Congress." *Carelli v. Howser* (C.A.6, 1991), 923 F.2d 1208, 1213.

Likewise, in *Robinson*, the review scheme of the Education of the Handicapped Act permitted the aggrieved party to invoke "carefully tailored" local administrative procedures, followed by federal judicial review. The court reasoned that Congress's intent could not have been to allow aggrieved parents to skip such administrative and judicial procedures with a Section 1983 action because that would "render superfluous most of the detailed procedural protections outlined in the statute." 468 U.S. at 1009–1011, 104 S.Ct. at 3467–3468, 82 L.Ed.2d at 763–765.

Nonetheless, "a plaintiff's ability to invoke [Section] 1983 cannot be defeated simply by '[t]he availability of administrative mechanisms to protect the plaintiff's interests'" or "by limited state grievance procedures for individuals." (Citations omitted.) *Blessing*, 520 U.S. at 347–348, 117 S.Ct. at 1363, 137 L.Ed.2d at 586. Other than the exceptional case, Section 1983 "remains a generally and presumptively available remedy for claimed violations of federal [rights]." *Livadas*, 512 U.S. at 133, 114 S.Ct. at 2083, 129 L.Ed.2d at 115.

(B) Brady Act Rights

Buyers contend that the Brady Act created a right for lawful possessors to receive a handgun. The Attorney General responds that the Brady Act did not create any such right, since Title 18 of the United States Code has traditionally not vested property rights in individuals.

Following *Blessing*, 520 U.S. at 340–341, 117 S.Ct. at 1359, 137 L.Ed.2d at 581–583, we must determine (1) whether the Brady Act was intended to benefit gun buyers, (2) whether the asserted right to receive a handgun when not a member of a prohibited class is too "vague and amorphous" for the courts to enforce, and (3) whether the Brady Act imposes a binding obligation upon the state to approve handgun sales for nonprohibited persons. Neither Section 922(s) nor the Brady Act itself directly addresses these issues. The Brady Act's preamble states:

"An Act to provide for a waiting period before the purchase of a handgun, and for the establishment of a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm."

The Brady Act was clearly intended to protect the public from handgun violence by instituting a records check system to ensure that prohibited classes of persons were not sold handguns.

We must turn to the entire legislative scheme of the Brady Act and "its object and policy" to determine if it recognizes a specific enforceable right. *Halderman*, 451 U.S. at 18, 101 S.Ct. at 1540, 67 L.Ed.2d at 708. The Brady Act was intended to benefit the public as a whole by protecting it from handgun violence. It prohibited certain persons from buying a handgun. As to lawful

purchasers, the Brady Act only ensures that, under specific circumstances, the state will not intervene in a handgun transfer where:

"(I) 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

"(II) the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law[.]" Section 922(s)(1)(A)(ii).

■■ The Brady Act, specifically Section 922(s), does not create an affirmative obligation upon the state to ensure that a handgun purchase takes place. Rather, it only guarantees that where otherwise allowed by law, the state will not intervene in the sale.

At first glance this may seem precatory, stating only a preference for certain state conduct. But another provision of the Brady Act demonstrates that a right is created. Section 925A provides:

"Any person denied a firearm pursuant to subsection (s) or (t) of section 922—

"(1) due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

"(2) who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922, may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs."

■■ This section provides a guarantee to lawful handgun buyers: that the state will not provide erroneous information or erroneously deny the transfer. The Brady Act is clear as to those grounds which prevent a gun transfer: that the transfer would be in violation of federal, state, or local law. Sections 922(s)(1)(A)(ii), 922(s)(1)(C)(ii), 922(s)(1)(D), 922(s)(2), 922(s)(4), 922(s)(6)(B), and 922(s)(6)(C). In light of Section 925A, the Brady Act established a federal right

in lawful gun buyers that states would not provide erroneous information or erroneously disapprove a handgun transfer.

This right is not so vague and amorphous as to be beyond the abilities of courts to enforce. The court may order that erroneous information be corrected or that the gun transfer be approved. Section 925A is specific as to this remedy. In fact, Section 925A would be superfluous if the obligation to provide correct information and to approve lawful transfers was merely precatory. Otherwise, there is no need to provide an enforcement mechanism within the Brady Act.

■ We cannot conclude that Congress intended Section 925A to foreclose Section 1983 as a remedial means of securing the Brady Act's created right. Section 925A states that an aggrieved buyer "may" bring suit under that provision. Buyers are not required in any way to use only 925A to protect their statutory rights, even though that provision may be a preferred method of right enforcement.

■ Buyers are correct that the Attorney General and BCI&I could not disapprove a gun transfer for failure to pay the Brady fee. Buyers provided no evidence to show that gun transfers were disapproved for this reason. Therefore, there is no basis for concluding that the Attorney General violated the Brady Act by improperly denying handgun transfers.[28]

■ Additionally, Section 922(s) did not create a right to have the Brady check conducted without the imposition of an administrative fee. Section 922(s) is silent as to the charging of fees. Buyers are correct that the Brady Act did not expressly provide authority to charge the fees. But nor did it disapprove of such fees. We may not fashion a federal statutory right out of mere silence. Congress must speak to the matter.[29]

■ Buyers failed to demonstrate that the Brady fee was used as a basis for approving or denying handgun transfers. There was no federal statutory right preventing the charging of the Brady fee. Thus, no right created by the Brady Act is relevant to buyers' challenge to the Brady fee.

iv. Procedural Due Process—Buyers and FFLs

---

28. Even had the Attorney General, through BCI&I, improperly denied a handgun transfer for failing to pay the Brady fee, Section 925A could be used to overturn this denial by judicial means. The right created by the Brady Act exists irrespective of the Brady fee; thus, the existence of the right to have information properly reported and a transfer properly approved has no bearing on the validity of the Brady fee, contrary to buyers' arguments.

29. As state and local officials were responsible for conducting Brady checks pursuant to Section 922(s), Congress could have left the charging of fees for Brady checks to be determined by state and local law.

(A) Generally

Appellants contend that the Brady fee constituted a deprivation of property without due process of law. They assert that the charging of the Brady fee was an established scheme requiring pre-deprivation hearing and notice, neither of which was afforded.[30]

Section 1 of the Fourteenth Amendment provides in part:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

 To recover via Section 1983 for a due process violation, plaintiffs must establish (1) that they have a protected life, liberty, or property interest, (2) that they were deprived of this protected interest, and (3) that the state did not afford them adequate procedural rights prior to the deprivation. *Hahn v. Star Bank* (C.A.6, 1999), 190 F.3d 708, 716, certiorari denied (2000), 529 U.S. 1020, 120 S.Ct. 1423, 146 L.Ed.2d 314, citing *Zinermon,* 494 U.S. at 125–126, 110 S.Ct. at 983, 108 L.Ed.2d at 113–114.

 The first step in the due process inquiry is determining if appellants were deprived of property. *I–Star Communications Corp. v. E. Cleveland* (N.D.Ohio 1995), 885 F.Supp. 1035, 1040, citing *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548. "Property interests are not created by the [United States] Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cleveland Bd. of Edn. v. Loudermill* (1985), 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 501; *Paul v. Davis* (1976), 424 U.S. 693, 708–709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405, 417–419, rehearing denied (1976), 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811. Thus, it must be found that state law vests appellants with property rights protected by due process.

 The Due Process Clause of the Fourteenth Amendment does not protect against all deprivations of life, liberty, or property by the state. Rather it protects against only deprivations "without due process of law." *McCollan,* 443 U.S. at 145, 99 S.Ct. at 2695, 61 L.Ed.2d at 442. In these claims, the deprivation of a citizen's interests by the state is not in itself unconstitutional; the deprivation without due process of law is unconstitutional. *Zinermon,* 494 U.S. at 125,

---

**30.** Appellants not only challenge the Brady fee on due process grounds, they also attack the Brady fee as inherently illegal, contending that it is not authorized under relevant Revised Code provisions. For purposes of clarity, we discuss whether the Brady fee was statutorily lawful in Part H, *infra.* Even if the procedure used to charge the Brady fee is not violative of due process, it may still be unauthorized under statute, and it is best to address these matters separately.

110 S.Ct. at 983, 108 L.Ed.2d at 114. An infringement of property interests is thus actionable under Section 1983 only if the state fails to provide due process. *Id.* at 126, 110 S.Ct. at 983, 108 L.Ed.2d at 114.

Where the state deprives a person of a protected interest through an established state mechanism or procedure, due process normally requires notice and a predeprivation hearing prior to state interference with the interest. *Parratt v. Taylor* (1981), 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420, 429–430, reversed on other grounds (1986), *Daniels,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662. The existence of post-deprivation remedies is largely irrelevant under such circumstances. *Harris v. Akron* (C.A.6, 1994), 20 F.3d 1396, 1401, citing *Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265, 278. But predeprivation procedures are not always required:

"[C]ases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of * * * due process * * *:

" '[Prior cases] merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate." ' " (Citations and footnote omitted.) *Parratt,* 451 U.S. at 539–540, 101 S.Ct. at 1915, 68 L.Ed.2d at 431–432, quoting *Phillips v. Commissioner* (1931), 283 U.S. 589, 596–597, 51 S.Ct. 608, 611, 75 L.Ed. 1289, 1297.

Whether due process is afforded prior to or after a deprivation by the state, the fundamental requirement is that the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo* (1965), 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66. The Supreme Court has rejected the proposition that "at a meaningful time and in a meaningful manner" always requires a predeprivation hearing, due to "the impracticability in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available." *Parratt,* 451 U.S. at 540–541, 101 S.Ct. at 1915–1916, 68 L.Ed.2d at 432. But this willingness to excuse the predeprivation hearing requirement "rest[s] in part on the availability of some meaningful opportunity

subsequent to the initial taking for a determination of rights and liabilities." *Id.* at 541, 101 S.Ct. at 1916, 68 L.Ed.2d at 432.[31]

▇ Where a predeprivation hearing is impracticable, courts must review the adequacy of state postdeprivation procedures. Here, whether the state provides a means of redress is relevant. For example, in *Parratt,* Nebraska "provide[d] a remedy to persons who believe they have suffered a tortious loss at the hands of the State. See Neb.Rev.Stat. § 81–8, 209 *et seq.* (1976)." *Id.* at 543, 101 S.Ct. at 1917, 68 L.Ed.2d at 434. The court also addressed the scope of remedy which the state must afford:

"It is argued that the State does not adequately protect the [aggrieved] respondent's interests because it provides only for an action against the State as opposed to its individual employees, it contains no provisions for punitive damages, and there is no right to trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under [Section] 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered * * * ." *Id.* at 543–544, 101 S.Ct. at 1917, 68 L.Ed.2d at 434.

After *Parratt,* the Supreme Court narrowed this exception to providing a predeprivation hearing. In *Zinermon,* the court acknowledged that *Parratt* applies where postdeprivation remedies are all that a state can be expected to provide due to the impossibility or impracticability of providing predeprivation remedies. The court then held that *Parratt* is not controlling when the state provides a procedure under which it is predictable that its officials might infringe protected rights. 494 U.S. at 136–139, 110 S.Ct. at 989–990, 108 L.Ed.2d at 120–123.

The court explained that the need for and adequacy of postdeprivation remedies must be reviewed under several balancing factors:

" 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Id.* at 127, 110 S.Ct. at 984, 108 L.Ed.2d

---

**31.** A predeprivation hearing is not required where there is an asserted negligent deprivation of a citizen's property interest without a pre-existing state procedure because negligent deprivations cannot be predicted beforehand. *Id.* at 541–543, 101 S.Ct. at 1916–1917, 68 L.Ed.2d at 432–434. We need not consider this exception to the predeprivation hearing requirement because appellants argue only that the Brady fee scheme was an established state mechanism.

at 115, quoting *Mathews v. Eldridge* (1976), 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33.

With this test, the court generally holds that the Constitution requires some kind of predeprivation hearing. But should the factors balance to the state's benefit, statutory means for a postdeprivation hearing or common-law tort remedies for erroneous deprivations satisfy due process. *Id.* at 127–128, 110 S.Ct. at 984, 108 L.Ed.2d at 114–115. Thus, "where a predeprivation hearing is unduly burdensome in proportion to the liberty [or property] interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process." (Citation omitted.) *Id.* at 132, 110 S.Ct. at 987, 108 L.Ed.2d at 118.

(B) Protected Interest

The first step in establishing a due process violation is demonstrating that the plaintiff has a recognizable, protected life, liberty, or property interest. Buyers assert that they have a state right to bear arms that cannot be infringed through the imposition of the Brady fee. FFLs and buyers both assert a right to retain their property, the amount of the Brady fee.

Section 4, Article I, Ohio Constitution states:

"The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power."

This provision "confers upon the people of Ohio the fundamental right to bear arms. However, this right is not absolute." *Arnold,* paragraph two of the syllabus. *Arnold* further explained Section 4:

"This provision is divided by two semicolons, coordinating three independent clauses. Rather than focusing merely on the preservation of a militia, as provided by the Second Amendment, the people of Ohio chose to go even further. Section 4, Article I not only suggests a preference for a militia over a standing army, and the deterrence of governmental oppression, it adds a third protection and secures to every person a fundamental *individual* right to bear arms for 'their *defense and security* * * *.' * * * This clause was obviously implemented to allow a person to possess certain firearms for defense of self and property." (Emphasis *sic.*) *Id.,* 67 Ohio St.3d at 43, 616 N.E.2d at 169.

The Ohio Supreme Court recognized the fundamental nature of this right to bear arms:

"The right of defense of self, property and family is a fundamental part of our concept of ordered liberty. To deprive our citizens of the right to possess any firearm would thwart the right that was so thoughtfully granted by our forefa-

thers and the drafters of our Constitution. For many, the mere possession of a firearm in the home offers a source of security. Furthermore, given the history of our nation and this state, the right of a person to possess certain firearms has indeed been a symbol of freedom." *Id.* at 43–44, 616 N.E.2d at 169–170.

▮ Nonetheless, this right is not absolute, and limited prohibitions may be enacted. *Id.* at 49, 616 N.E.2d at 173–174. The right is "subject to reasonable regulation" which, under the state's police powers, must "bear a real and substantial relation" to secure "the health, safety, morals or general welfare of the public." *Id.* at 46–47, 616 N.E.2d at 171–172; see *Mosher v. Dayton* (1976), 48 Ohio St.2d 243, 247, 2 O.O.3d 412, 414, 358 N.E.2d 540, 542–543.[32] *Arnold* continued:

"Any form of gun control legislation is destined to attract much attention. That does not change the fact that there must be some limitation on the right to bear arms to maintain an orderly and safe society while, at the same time, moderating restrictions on the right so as to allow for the practical availability of certain firearms for purposes of hunting, recreational use and protection." *Id.* at 48, 616 N.E.2d at 173.

▮ Thus, the recognized state right to bear arms is subject to reasonable regulation which advances the health, safety, morals, or general welfare of the public. The Brady Act was implemented for that purpose, to protect the public from handgun violence by ensuring that prohibited classes of persons do not purchase handguns. In implementing the Brady Act, the Attorney General furthered this goal. The Brady checks did not, in themselves, impermissibly infringe upon buyers' right to bear arms.

▮ The other interest of both buyers and FFLs is the amount of the Brady fee itself. The Brady fee was directly charged to the FFL by the state via the "900" telephone number, and only later charged by FFLs to the buyers. They challenge the Brady fee as part of an administrative scheme enforced within the state's police powers. The first factor applicable to a due process analysis in the instant case is appellants' interest in the amount of the Brady fee. That the claims involve a property interest in $13 or $15 does not render appellants' claims less weighty or worthy. Instead, we still focus on the effect of the state's procedures in light of the above constitutional standards.[33]

---

**32.** *Mosher* went even further:

"Neither federal nor state law states that the right of an individual to bear arms is supreme over the authority of a governmental until under the police power to regulate the purchase of arms in a reasonable manner." *Id.* at 248, 2 O.O.3d at 414, 358 N.E.2d at 543.

**33.** As succinctly stated by the United States Supreme Court:

(C) Risk of Erroneous Deprivation

The Brady Act recognizes that an individual buyer may erroneously be disapproved for a handgun transfer. Section 925A then provides a remedy for any such erroneous deprivation.

There was also the risk that the Brady fee would be erroneously imposed. This would occur if the Brady fee was, in fact, not authorized by Ohio law as appellants contend. An interesting situation thus exists. Unlike the normal unauthorized-action case, the Brady fee was imposed as part of an established state scheme, not as an individual, random deprivation. Such random deprivations occur, for example, when a prison guard deprives a prisoner of his property, as in *Parratt* and *Hudson v. Palmer* (1984), 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393. But the situation here was also unlike the normal, established procedure case, wherein the individual deprivation occurs as part of an otherwise unchallenged established procedure.

If the Brady fee was an unauthorized fee, the state need only provide a postdeprivation remedy. *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916, 68 L.Ed.2d at 432–433. If it was part of an established scheme, the state had to provide a predeprivation hearing, except where to do so would be impracticable. In such case, a postdeprivation remedy which adequately addressed appellants' loss was necessary. *Zinermon,* 494 U.S. at 128, 110 S.Ct. at 984, 108 L.Ed.2d at 115–116. In either case, the risk of deprivation concerns only the amount of the Brady fee, which was addressable through a monetary remedy.

(D) Governmental Interest

Due process generally requires notice and a hearing prior to the deprivation, unless such is impracticable. In this case, notice is not contested. FFLs were told that the Brady fee would be charged and how it would be charged. All evidence indicates that buyers were made aware of this arrangement, even if only at the time they sought to effectuate a gun transfer. But no predeprivation hearing was afforded to individual FFLs or buyers before the charging of the Brady fee in each separate gun transfer. Thus, under *Parratt*'s general rule that an established procedure requires a predeprivation hearing, there arguably is a due process violation.

---

"It is * * * true that Burch's interest in avoiding five months' confinement is of an order different from inmate Parratt's interest in mail-order materials valued at $23.50. But the reasoning of *Parratt* * * * emphasizes the State's inability to provide predeprivation process because of the random and unpredictable nature of the deprivation, not the fact that only property losses were at stake." *Zinermon,* 494 U.S. at 132, 110 S.Ct. at 987, 108 L.Ed.2d at 118.

It is understandable that the state did not provide a means for appellants to challenge the Brady fee prior to individual transactions. It would have been highly impractical to have allowed individual challenges to a $13 or $15 fee. The Brady Act mandated prompt action by law enforcement in conducting Brady checks. Prior to *Printz,* the BCI&I had to conduct the Brady check in five days or less. Section 922(s)(2). After *Printz,* the voluntary Brady checks conducted by BCI&I were to be performed in two days. The federalized sheriff's office deputies had to conduct Brady checks in five days. If a Brady check was not quickly performed, the sale was deemed approved under the Brady Act. See Section 922(s)(1)(A)(ii). Thus, an unlawful sale could be prevented only by law enforcement acting quickly to discover if a potential buyer was a member of a prohibited class.

 Had the state created a separate administrative means for individual buyers and FFLs to challenge the Brady fee before a sale, the Brady Act's mandate for quick action would have been thwarted. It was impracticable for the state to provide a pre-deprivation hearing to individual buyers and FFLs before charging the Brady fee.

(E) Postdeprivation Remedies

Appellants' inability to challenge individual payments of the Brady fee is not determinative. We now focus on whether the state provided appellants a postdeprivation remedy adequate to protect their due process rights. In this respect, two statutory schemes are relevant.

First, and less important, is the declaratory judgment statute, R.C. Chapter 2721. R.C. 2721.03 provides:

"Subject to division (B) of section 2721.02 of the Revised Code, any person * * * whose rights, status, or other legal relations are affected by a constitutional provision, statute, [or] rule as defined in section 119.01 of the Revised Code * * * may have determined any question of construction or validity arising under the * * * constitutional provision, statute, [or] rule * * * and obtain a declaration of rights, status, or other legal relations under it."

R.C. 2721.02(A) provides:

"Subject to division (B) of this section [not relevant here], courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for under this chapter. The declaration may be either affirmative or negative in form and effect. The declaration has the effect of a final judgment or decree."

By these provisions, the state provided appellants a means to challenge the legal validity of the Attorney General's decision to charge the Brady fee, as this was done pursuant to statutory and administrative authority. See R.C. 109.54, 109.55, and 109.57; see, also, Ohio Adm.Code 109:5–1–01. Appellants could have sought an earlier declaration that the Brady fee, as part of the state's implementation of the Brady Act, was not authorized or was an unconstitutional infringement of their rights. *Burger Brewing Co. v. Ohio Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261, paragraph one of the syllabus; *State ex rel. Erie Cty. Democratic Executive Commt. v. Brown* (1966), 6 Ohio St.2d 136, 138, 35 O.O.2d 154, 155, 216 N.E.2d 369, 370. A party may also pray for monetary relief, should it be granted a declaratory judgment in its favor. *Jeppe v. Blue Cross of Northeast Ohio* (1980), 67 Ohio App.2d 87, 92, 21 O.O.3d 406, 409–410, 425 N.E.2d 947, 951.

More important, the state provided appellants with a more specific remedy than declaratory judgment. The rule has long been that "an action for declaratory judgment is inappropriate where special statutory proceedings would be bypassed." *Rocky Fork Hunt & Country Club v. Testa* (1997), 120 Ohio App.3d 442, 447, 698 N.E.2d 80, 83, citing *State ex rel. Albright v. Delaware Cty. Court of Common Pleas* (1991), 60 Ohio St.3d 40, 42, 572 N.E.2d 1387, 1388–1389. To this end, the General Assembly enacted R.C. Chapter 2723, Enjoining and Recovering Illegal Taxes and Assessments. R.C. 2723.01 provides:

"Courts of common pleas may enjoin the illegal levy or collection of taxes and assessments and entertain actions to recover them when collected, without regard to the amount thereof, but no recovery shall be had unless the action is brought within one year after the taxes or assessments are collected."

This provision was long ago held to satisfy the requirements of due process in allowing a citizen to challenge taxes and other assessments. *State ex rel. v. Jones* (1894), 51 Ohio St. 492, 516–517, 37 N.E. 945, 951–952. In *Jones,* the court reiterated a basic rule regarding due process:

"[W]henever, by laws of a state, or by state authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole state or some limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed, in ordinary courts of justice, with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections." *Id.* at 516, 37 N.E. at 952, citing *Davidson v. New Orleans* (1877), 96 U.S. 97, 24 L.Ed. 616.

The court then held that then Section 5845 of the Revised Statutes, now R.C. 2723.01, satisfied the requirements of due process by affording a property owner

an adequate postdeprivation means to contest a tax or assessment. *Id.* at 517–518, 37 N.E. at 952, citing *McMillen v. Anderson* (1877), 95 U.S. 37, 23 L.Ed. 335. This provision was subsequently upheld again as affording due process. *Hammond v. Winder* (1919), 100 Ohio St. 433, 445–446, 126 N.E. 409, 412–413 (discussing then-Section 12075, General Code, now R.C. 2723.01).

In *Superior Films, Inc. v. Dept. of Edn.* (1953), 159 Ohio St. 315, 335, 50 O.O. 305, 314, 112 N.E.2d 311, 321, reversed on other grounds (1954), 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329, the Ohio Supreme Court determined that the inspection fee charged by the Department of Education under the then-existing censorship scheme was subject to enjoinment pursuant to Section 12075, General Code, now R.C. 2723.01. There, the plaintiffs challenged the inspection fee as an unlawful excise tax in excess of the costs necessary to make film inspections. The court found that the plaintiff was estopped from challenging the fees because it had failed to seek recovery under the statute. *Id.*

The relevance of R.C. 2723.01 to inspection fees was again addressed in *Paramount Film Distrib. Corp. v. Tracy* (1962), 118 Ohio App. 29, 24 O.O.2d 362, 193 N.E.2d 283, affirmed (1963), 175 Ohio St. 55, 23 O.O.2d 352, 191 N.E.2d 839. That court reviewed the history and purpose of R.C. Chapter 2723, and its intent to supersede prior common-law actions to enjoin or collect illegal fees and taxes from state collectors. Relying upon *Superior Films* and other authorities, the court then found that the film inspection fees were subject to attack pursuant to R.C. 2723.01:

"Considering the common-law context of [the] enactment, the fact that the statute is remedial, the accepted broad meaning of the word, 'taxes,' in remedial statutes, and the opinion of the Supreme Court in the *Superior Films* case, we hold that Chapter 2723 does apply to the fees collected under the censorship statute." *Id.* at 34, 24 O.O.2d at 365, 193 N.E.2d at 286.

The Brady fee is similar to the film inspection fee at issue in *Superior Films* and *Paramount Film.* The film inspection fee was designed to cover the board's expenses and other costs. That fee was charged when the film was submitted to the Board of Censors to examine and determine whether the film should be censored. The board would then judge whether the film was " 'of a moral, educational or amusing and harmless character.' " *Superior Films,* 159 Ohio St. at 320, 50 O.O. at 307, 112 N.E.2d at 314. Likewise, the Brady fee was charged at the time the Brady form was submitted to BCI&I. It was charged to cover the administrative expenses of conducting the Brady checks. The Brady check would review the buyer's records to determine if the buyer was in a prohibited class or whether the handgun transfer could be completed.

In light of these similarities, R.C. 2723.01 was available to challenge the legality of the Brady fee, whether before or after its imposition. Pursuant to R.C.

2723.01, appellants could have challenged the Brady fee's legality and sought a refund of the paid Brady fees.[34] R.C. 2723.01 thus provided a postdeprivation remedial means for appellants. Even if R.C. 2723.01 was not available, appellants could have earlier sought declaratory relief under R.C. 2721.03.

■ The imposition of the Brady fee was not, in itself, a violation of appellants' due process rights. Although appellants were not afforded predeprivation hearings, the state provided them statutory postdeprivation remedies adequate to meet the requirements of due process.

c. "Under Color of State Law"

The scheme devised by the Attorney General for conducting and charging for Brady checks was highly unusual. In fact, this court's research has not revealed a similar scheme being implemented by the state of Ohio on any previous occasion.

Briefly, the system devised by the Attorney General worked as follows: To have a Brady check conducted, FFLs transmitted the Brady form to the BCI&I via the "900" telephone number. This automatically charged the Brady fee to FFLs' telephone bills. FFLs could then pass on the cost of the Brady fee to buyers or, as Davis Guns did in its promotional sale, choose not to pass on the cost. The Attorney General asserts that because FFLs' handling of the Brady fee was not regulated, FFLs could even charge the buyer more than the Brady fee, thus making a profit on the Brady check.

This scheme created two classes of potentially harmed plaintiffs. FFLs were directly charged the Brady fee by BCI&I. Buyers, though, were not directly charged by BCI&I. Instead, their payment of the Brady fee was left to FFLs' discretion. We must therefore determine if the Brady fee as incurred first by FFLs and then by buyers was done "under color of state law."

i. Generally

■ Section 1983's "under color of state law" element is akin to the "state-action" requirement of the Fourteenth Amendment, and it "excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Sullivan*, 526 U.S. at 50, 119 S.Ct. at 985, 143 L.Ed.2d at 143.[35] To demonstrate

---

34. Appellants were aware of *Paramount Film* and thus presumably its holding. In their motion for summary judgment, they cited the case for the proposition that they could seek the recovery of unlawful fees via a common-law action. Appellants did not call to the trial court's attention, though, that in light of *Paramount Film*, R.C. 2723.01 provides a postdeprivation remedy.

35. Although conduct satisfying the state action requirement of the Fourteenth Amendment will satisfy Section 1983's requirement of action "under color of state law," the reverse is not necessarily true. *Groman v. Twp. of Manalapan* (C.A.3, 1995), 47 F.3d 628, 638, fn. 15.

conduct taken under color of state law, there must be "*both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' " *Id.*, quoting *Lugar v. Edmondson Oil Co.* (1982), 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–2754, 73 L.Ed.2d 482, 495. Any analysis must begin "by identifying 'the specific conduct of which the plaintiff complains.' " *Sullivan* at 51, 119 S.Ct. at 985, 143 L.Ed.2d at 144, quoting *Blum v. Yaretsky* (1982), 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534, 546. The issue " 'is not whether the state was involved in some way in the relevant events, but whether the action taken can be attributed to the state itself[:] * * * "whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." ' " *Groman v. Twp. of Manalapan* (C.A.3, 1995), 47 F.3d 628, at 638–639, quoting *NCAA v. Tarkanian* (1988), 488 U.S. 179, 192, 109 S.Ct. 454, 462, 102 L.Ed.2d 469, 485.

 It must be considered whether the allegedly violative activity is done by or at the behest of the state or whether it " 'turns on * * * judgments made by private parties' without 'standards * * * established by the State.' " *Sullivan* at 52, 119 S.Ct. at 986, 143 L.Ed.2d at 145, quoting *Blum*, 457 U.S. at 1008, 102 S.Ct. at 2788, 73 L.Ed.2d at 549. Close attention to the facts must be paid when conducting any state-action or under-color-of-state-law inquiry. *Groman*, 47 F.3d at 641, citing *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2754, 73 L.Ed.2d at 496–497.

 The traditional definition of "under color of state law" requires that the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins* (1988), 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40, 49. State employment is enough to render the defendant a state actor, especially where the defendant abuses the position given him. *Id.* at 49–50, 108 S.Ct. at 2255, 101 L.Ed.2d at 49–50. A state employee acts under color of state law when acting in an official capacity or when exercising responsibilities pursuant to state law. *Id.*[36]

---

**36.** "Under color of state law" is broadly construed with regard to state employees. Only once has a state employee not been acting under color of state law. In *Polk Cty. v. Dodson* (1981), 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509, a public defender was not acting under color of state law when performing the traditional functions of criminal defense counsel, due to his professional independence from and opposition to the state. In *West*, the prison doctor who was the primary defendant was not a regular state employee. Instead, the state contracted with him to provide services to prison inmates. Still, his actions in that role were deemed attributable to the state. 487 U.S. at 56–57, 108 S.Ct. at 2259–2260, 101 L.Ed.2d at 54–55.

 It is more difficult to prove state action where the defendant is a private citizen. Section 1983 and the Fourteenth Amendment to the United States Constitution "erec[t] no shield against merely private conduct, however discriminatory or wrongful." *Adickes v. S.H. Kress & Co.* (1970), 398 U.S. 144, 169, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142, 161. The fact that a private individual or entity receives state funding or is regulated by the state does not, without more, convert the private actor's conduct into the state action:

"[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786, 73 L.Ed.2d at 546.

It must be inquired whether the state, in any fashion, made the defendant its agent. See *Martinez v. California* (1980), 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481, 489, rehearing denied (1980), 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606.

 Beyond actual state law, Section 1983 condemns action taken pursuant to "custom or usage." Any action pursuant to "custom or usage" must have some support by the state. *Adickes,* 398 U.S. at 163, 90 S.Ct. at 1611, 26 L.Ed.2d at 157–158. "Custom or usage" is that "which has become common law," *id.* at 165, 90 S.Ct. at 1612, 26 L.Ed.2d at 159, such that "for purposes of [Section] 1983[,] [it] must have the force of law by virtue of the persistent practices of state officials." *Id.* at 167, 90 S.Ct. at 1613, 26 L.Ed.2d at 159.[37] This interpretation recognizes that the "settled practices by state officials may, by imposing sanctions or withholding benefits, transform private predilections into compulsory rules of behavior no less than legislative pronouncements." *Id.* at 168, 90 S.Ct. at 1614, 26 L.Ed.2d at 160.

ii. Tests

 Different tests have arisen to judge when private conduct constitutes state action.[38] The "sovereign-function" test focuses on whether the complained

---

37. "Custom or usage" does not include "a practice that reflects long-standing social habits, generally observed by the people in a locality" or of "the people living in the State." Rather it ·requires some state sanction, whether by direct endorsement, misadministration of the law, or a neglect or refusal to enforce the law. *Id.*

38. These tests involve many of the same aspects:

"[That] which would convert [a] private party into a state actor might vary with the circumstances of the case. * * * [T]he Court has articulated a number of different factors or tests in different contexts * * *. Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that

activity is traditionally a state function. The complainant must show that the state delegated to the defendant a power or prerogative "traditionally exclusively reserved to the State." *Flagg Bros., Inc. v. Brooks* (1978), 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185, 194; see *Rendell–Baker v. Kohn* (1982), 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418, 428–429. The private party must have assumed "*all* of the attributes of [the government]" and has performed "the *full* spectrum of [governmental] powers." (Emphasis added.) *Hudgens v. NLRB* (1976), 424 U.S. 507, 519, 96 S.Ct. 1029, 1036, 47 L.Ed.2d 196, 207. The mere fact that " 'a private entity performs a function which serves the public does not make its acts [state] action.' " *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.* (1987), 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427, 453. "[O]nly those undertakings that are uniquely sovereign in character qualify as traditional and exclusive state functions." *United Auto Workers, Local 5285 v. Gaston Festivals, Inc.* (C.A.4, 1995), 43 F.3d 902, 907.[39]

 The "compulsion" test requires that the state exercise such coercive power over or provide such significant encouragement to the private actor, either overtly or covertly, that the choice of the private actor must be deemed to be that of the state. *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785, 73 L.Ed.2d at 546–547. More than mere acquiescence or approval in the initiatives of the private party is necessary to hold the state responsible for the actor's conduct. *Id.* The state must use its power over the private actor to control or direct the private actor's conduct.

---

confronts the Court in such a situation need not be resolved here." *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2754–2755, 73 L.Ed.2d at 496–497.

The United States Supreme Court more recently noted:

"Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." (Citations omitted.) *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 621–622, 111 S.Ct. 2077, 2083–2084, 114 L.Ed.2d 660, 674.

Federal courts do not see the *Edmonson* passage as requiring only one type of analysis. *Edmonson* seems to neither restrict courts to only one approach nor foreclose courts from employing various approaches as warranted by the particular facts of a given case. See *Groman*, 47 F.3d at 639, fn. 17; see, also, *Bier v. Fleming* (C.A.6, 1983), 717 F.2d 308, 310–311.

**39.** The sovereign-function test has been limited to specific matters: administration of elections, operation of a company town, eminent domain, peremptory challenges in jury selection, and, under limited circumstances, operation of a municipal park. Other matters that fall traditionally within the exclusive prerogative of the state include: provision of electricity and other utilities, coordination and governance of college and amateur athletics, schooling for maladjusted children, private school administration, and care of foster children. *Id.*

Under the "symbiotic relationship," or "nexus," test, a private party's conduct constitutes state action when "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the latter may be fairly treated as that of the State itself." *Sullivan*, 526 U.S. at 52, 119 S.Ct. at 986, 143 L.Ed.2d at 145, citing *Blum*. Where there is heavy state regulation of an activity, " '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.' " *Id.*, quoting *Jackson v. Metro. Edison Co.* (1974), 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 483. Even heavily regulated public utilities with government protected monopolies are not actors under color of state law without the requisite nexus. *Id.* at 351, 95 S.Ct. at 453, 42 L.Ed.2d at 484. The same holds true even where the state provides significant financial assistance to a private entity. *Cannon v. Univ. of Chicago* (C.A.7, 1977), 559 F.2d 1063, 1069, reversed on other grounds (1979), 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560. The state must "affirmatively support and be directly involved in the specific conduct which is being challenged." *Id.* See, also, *Wolotsky v. Huhn* (C.A.6, 1992), 960 F.2d 1331, 1335. Of course, a private defendant acts as a state actor when he is "a willfull participant in joint action with the State or its agents." *Dennis v. Sparks* (1980), 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185, 189.

iii. FFLs

Without question, BCI&I's charging the Brady fee to FFLs via the "900" telephone number was done under color of state law. Under the Brady check scheme in effect either before or after *Printz*, FFLs were directly charged the Brady fee by BCI&I, a state agency acting pursuant to the Attorney General's mandate. The Superintendent's June 30, 1997 letter to Ohio's FFLs confirms this fact: "You [the FFL] will be billed $13.00 for the service." Thus, Betty Montgomery, an individual, acting as Attorney General, was ultimately responsible for the state's utilizing the "900" telephone number system. FFLs were affected by state action, but as determined above, this state action did not deprive FFLs of their property without due process of law.

iv. Buyers

Whether buyers were affected by state action requires a more thorough analysis. The state never directly charged buyers the Brady fee. BCI&I charged the Brady fee only to FFLs. FFLs then charged the fee to buyers. The record contains no evidence that FFLs were regulated by the state in any manner as to how they handled the Brady fee. FFLs could charge buyers the cost of the Brady fee, or they could charge more or less than the Brady fee. Davis Guns's promotional sale, during which it did not charge the Brady fee, is evidence of this lack of regulation. Thus, we must determine if FFLs, as private entities, were somehow converted into state actors.

The charging of fees is not a traditional state function, akin to elections or company towns. In general, FFLs are heavily regulated by the federal government as to the manner in which they operate and to whom they may sell guns. See Sections 921 to 926A, Title 18, U.S.Code. Unlike the federal government, the state does not heavily regulate FFLs' day-to-day operations. Instead, Ohio regulates the possession and use of firearms through its Criminal Code, R.C. Title 29, and other sections prohibiting possession and use of firearms within restricted areas such as schools, shooting ranges, and wildlife and forestry areas. R.C. 3313.66, 3316.662, and 1533.83 to 1533.85; Ohio Adm.Code Chapter 1501.

The record in this case demonstrates that as to the Brady checks, BCI&I—and thus the Attorney General—did not enact any regulations governing the relationship between FFLs and their customers. Although BCI&I was responsible for conducting Brady checks, and accordingly notified FFLs of this responsibility, the record does not indicate that BCI&I was responsible for ensuring that or was even concerned whether the Brady fee was paid by buyers. The decision to have buyers pay the cost of the Brady fee was left to FFLs' judgments.

In *Sullivan*, the United States Supreme Court dealt with state office/private entity relationships analogous to the instant arrangement, in determining when a private entity acts "under color of state law." The Pennsylvania Workers' Compensation Act was amended to allow a self-insured employer or a private insurer to withhold payment for disputed medical treatments pending an independent "utilization review." The amended Act set forth a specific procedure for the employer or insurer to request such a review. Employees and employee representatives initiated a Section 1983 action, alleging that withholding benefits without pre-deprivation notice and an opportunity to be heard deprived them of property without due process of law and that such action was done under color of state law.

The Supreme Court first pointed out that all parties agreed that the public officials responsible for administering the workers' compensation system and fund were state actors. *Sullivan*, 526 U.S. at 50, 119 S.Ct. at 985, 143 L.Ed.2d at 143–144. The case thus turned on the insurer's decision to seek a "utilization review": "whether a *private insurer's* decision to withhold payment for disputed medical treatment may be fairly attributable to the State so as to subject insurers to the constraints of the Fourteenth Amendment." (Emphasis *sic*.) *Id.* at 51, 119 S.Ct. at 986, 143 L.Ed.2d at 144. The Supreme Court noted that the plaintiffs "do not assert that the decision to invoke utilization review should be attributed to the State because the State compels or is directly involved in that decision. Obviously the State is not so involved. It authorizes, but does not require, insurers to withhold payments for disputed medical treatment." *Id.* at 52, 119 S.Ct. at 986, 143 L.Ed.2d at 145.

The *Sullivan* plaintiffs asserted that the decision of the insurer was attributable to the state because the state encouraged insurers to withhold payments when it amended the statute. The Supreme Court did not doubt "that the State's decision to provide insurers the option of deferring payment for unnecessary and unreasonable treatment pending review can in some sense be seen as encouraging them to do just that." *Id.* at 53, 119 S.Ct. at 986, 143 L.Ed.2d at 145. The Supreme Court continued:

"The State's decision to allow insurers to withhold payments pending review can just as easily be seen as state inaction, or more accurately, a legislative decision not to intervene in a dispute between an insurer and an employee * * *. The 1993 amendments, in effect, restored to insurers the narrow option, historically exercised by employers and insurers before the adoption of Pennsylvania's workers' compensation law, to defer payment of a bill until it is substantiated. The most that can be said of the statutory scheme, therefore, is that whereas it previously prohibited insurers from withholding payment for disputed medical services, it no longer does so. Such permission of a private choice cannot support a finding of state action. As we have said before, our cases will not tolerate 'the imposition of Fourteenth Amendment restraints on private action by the simple device of characterizing the State's inaction as "authorization" or "encouragement." ' " *Id.* at 53–54, 119 S.Ct. at 987, 143 L.Ed.2d at 146.

■ This reasoning controls the instant case. The Attorney General and BCI&I took no action as to the FFLs' ability to charge buyers the Brady fee. Without *any* governmental action in the matter, it cannot be said that FFLs, as private entities, functioned as state actors. The state did nothing compelling FFLs to conduct their business one way or the other.

FFLs and the Attorney General were not so intimately tied to one another that the act of one must be deemed the act of the other. As noted above, the Attorney General in no way prescribed what action the FFLs could take regarding the Brady fee. *Sullivan*'s reasoning is easily adaptable to the instant case:

"The State's decision to allow [FFLs to take any action they choose as to the Brady fees] can just as easily be seen as state inaction, or more accurately, a [governmental] decision not to intervene in a dispute between [the FFL] and [the buyer] * * *. Such permission of a private choice cannot support a finding of state action." *Id.*

Although the Attorney General's decision to charge FFLs the Brady fee was conduct done under color of state law, "the action of [FFLs] later [to charge buyers] cannot be fairly characterized as state action." *Martinez*, 444 U.S. at 284–285, 100 S.Ct. at 559, 62 L.Ed.2d at 489. Buyers cannot demonstrate that

the Attorney General compelled FFLs to pass on the cost of the Brady fee to buyers. Nor can buyers show that the Attorney General and FFLs were so intimately tied as to be acting as if a single, governmental entity. The decisions of FFLs were not "dictated or guided by the state." *Groman,* 47 F.3d at 642.

■ Nor can it be said that FFLs charged buyers the Brady fee in accordance with state "custom or usage." Although it may have been fairly well understood that FFLs would pass on the cost of the Brady fee to buyers, buyers did not present any evidence showing that any such understanding that may have existed had the "force of law." *Adickes,* 398 U.S. at 171, 90 S.Ct. at 1615, 26 L.Ed.2d at 162. Even if such an understanding existed, Davis Guns's own action demonstrates that it was not compulsory. On its own, Davis Guns chose not to not pass on the Brady fee cost to some of its buyers, and the Attorney General took no action against Davis Guns. The decision to pass on the cost of the Brady fee was left solely to the FFLs' discretion, making their conduct purely private and outside Section 1983's purview.

Buyers cannot demonstrate that in making them pay the Brady fee, the FFLs' action was conduct taken "under color of state law." As held above, buyers were not deprived of any property or rights, without dues process of law.

d. Qualified Immunity

i. Generally

■ The courts have recognized that state officials possess a qualified immunity defense when sued under Section 1983. *Johnson v. Fankell* (1997), 520 U.S. 911, 914, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108, 113–114. Under this defense, " 'officials performing discretionary function[s], generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 914–915, 117 S.Ct. at 1803, 138 L.Ed.2d at 114, quoting *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410.

Qualified immunity is "valuable" to state officials for two reasons:

"First, if it is found applicable at any stage of the proceedings, it determines the outcome of the litigation by shielding the official from damages liability. Second, when the complaint fails to allege a violation of clearly established law or when discovery fails to uncover evidence sufficient to create a genuine issue whether the defendant committed such a violation, it provides the defendant with an immunity from the burdens of trial as well as a defense to liability." (Footnote omitted.) *Johnson,* 520 U.S. at 915, 117 S.Ct. at 1803, 138 L.Ed.2d at 114.

Furthermore, deciding constitutional questions before determining the question of qualified immunity "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson v. Layne* (1999), 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818, 827, citing *Cty. of Sacramento v. Lewis* (1998), 523 U.S. 833, 840–842, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043, 1053–1055, fn. 5.

In practice, whether an official may be held personally liable or protected by qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Wilson,* 526 U.S. at 614, 119 S.Ct. at 1699, 143 L.Ed.2d at 830, quoting *Anderson v. Creighton* (1987), 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523, 530. What "clearly established" means depends largely "upon the level of generality at which the relevant 'legal rule' is to be established." *Id.* For purposes of qualified immunity, "clearly established" means that " '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " *Wilson,* 526 U.S. at 615, 119 S.Ct. at 1699, 143 L.Ed.2d at 830, quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531.

ii. Attorney General

As noted above, buyers have an established right to not have state officials provide erroneous information when conducting the Brady check, and to not have state officials erroneously deny a handgun transfer. Buyers and FFLs both possess the right to retain their property, the amount of the Brady fee, except where the state lawfully assesses the fee and provides them with due process. But, as also held above, the Attorney General did not infringe upon these rights in devising the Brady fee system.

Additionally, the record demonstrates that the Attorney General was aware of appellants' rights and sought to create a system that would not violate those rights. The USAG repeatedly told the Attorney General that involuntary Brady checks could be performed by the Attorney General after *Printz.* The Attorney General responded that this would not be allowed by Ohio law. The Attorney General's correspondence, both internally and to the USAG, demonstrates that the Attorney General made a concerted effort to create a system that could further the Brady Act's purpose to protect the public and coexist with the recognized rights of gun owners and buyers.

In light of the in-depth analysis the Attorney General undertook in devising the Brady fee system and the fact that appellants' rights were not violated, it can only be said that the Attorney General is entitled to qualified immunity. Even had the Brady fee abridged appellants' rights in some respect, it would be difficult for appellants to show that the Attorney General should not be entitled to qualified immunity. The Attorney General's efforts in attempting to find a workable scheme showed restraint, wise counsel, and a keen understanding of appellants' rights.

6. Recapitulation

The trial court correctly found that appellants could not prove an infringement of their rights or due process taken under color of state law as required by Section 1983. Even had appellant's rights been infringed in some way, the Attorney General would be entitled to qualified immunity. The trial court did not err in granting summary judgment to the Attorney General on appellants' Section 1983 claim. The second assignment of error is overruled.

Assignment of Error No. 1:

"The court erred in finding that the Attorney General had lawful authority to charge fees to allow firearm dealers to transmit statements of intent to purchase handguns."

Issues Presented for Review:

"A. The court erred in finding that the Brady Act prohibited transfer of a handgun without a background check.

"B. The court erred in finding that the Attorney General/[BCI&I] was the designee of the 'Chief Law Enforcement Officer[s]' of Ohio.

"C. The court erred in finding that [BCI&I] was authorized to conduct background checks and to charge fees.

"D. The court erred in finding that firearm purchasers 'consented' to background checks and signed a valid 'waiver.'

"E. The court erred in dismissing the claims of persons who did not sign the purported 'waiver.'

"F. The court erred in finding that Ohio law authorized the background checks and fees."

## D. COMMON–LAW CLAIM

Appellants seek a refund of all Brady fees paid on grounds that the fee scheme was not authorized by Ohio law. The Attorney General responds that the fee

scheme was authorized as part of the overall Brady system, and that the Brady fee was within the ambit of relevant statutes.

1. Generally

Count 2 of appellant's complaint is a common–law claim in assumpsit. But the action of assumpsit was abolished with the adoption of Civ.R. 2, and only one form of action—the civil action—now exists. See 17 Ohio Jurisprudence 3d (1980), Contracts, Section 10. Assumpsit was a contract remedy:

"The common-law action of assumpsit was a remedy by which a compensation in damages could be recovered for the nonperformance of a contract under seal, and not of record, but either express of implied, written or verbal. * * * [I]n the course of its common law development, assumpsit acquired the dignity of a distinct form of action, which superceded debt, became concurrent with account, and with case upon a bailment, a warranty, and bills of exchange, and competed with equity in the case of essentially equitable quasi contracts growing out of principles of unjust enrichment.

"* * *

"It is a general rule at common law that assumpsit lies only upon an express or implied contract. Quasi contracts or contracts implied in law are included, although such obligations are contracts in name only, as they do not have the essential requisites of what are ordinarily understood as contracts. * * * [I]t is well established that general assumpsit for money had and received lies to recover the proceeds of the sale of goods which have been taken without knowledge or consent of the owner." 17 Ohio Jurisprudence 3d, Contracts, Section 10.

Thus, in a technical sense, appellants' complaint is invalid to the degree that they attempt to raise a claim that is no longer a recognized cause of action. Nor did appellants show any contractual relationship between themselves and the Attorney General.

More important, appellants' assumpsit claim was abrogated with the enactment of R.C. Chapter 2723, Enjoining and Recovering Illegal Taxes and Assessments. R.C. 2723.01 provides:

"Courts of common pleas may enjoin the illegal levy or collection of taxes and assessments and entertain actions to recover them when collected, without regard to the amount thereof, but no recovery shall be had unless the action is brought within one year after the taxes or assessments are collected."

As noted above in *Superior Films,* the Ohio Supreme Court determined that the inspection fees charged by the Department of Education under the then-existing censorship scheme were subject to enjoinment pursuant to then Section

12075, General Code, now R.C. 2723.01. *Id.* at 335, 50 O.O. at 314, 112 N.E.2d at 321. There, the plaintiff challenged the inspection fee as an unlawful excise tax exceeding the necessary costs to make film inspections. The court found that the plaintiff was estopped from challenging the fees because it had failed to seek recovery under what is now R.C. 2723.01. *Id.*

R.C. 2723.01 was extensively discussed in *Paramount Film*. That court reviewed the history and purpose of R.C. Chapter 2723 and the General Assembly's intent to have the statute supersede prior common-law actions to enjoin or collect illegal fees and taxes from state collectors. *Id.* at 30–32, 24 O.O.2d at 362–364, 193 N.E.2d at 283–285. The court stated:

"When compared to the status of the remedy at law prior to 1856, it is clear that the scope of the statutory remedy includes all the pre-existing rights at law and goes further to broaden the grounds of recovery. At the same time the Legislature provided a one-year statute of limitations. This provision is a recognition of the fact that while the taxpayer needs a remedy against illegal exactions, yet the government must be provided with a reasonable basis for estimating revenues and making appropriations, and the collecting officer deserves protection from prolonged contingent liability.

"To interpret [R.C.] Chapter 2723 as being a cumulative remedy in the alternative with the common-law remedies, either being available at the taxpayer's option, is incompatible with the structure, operation and purpose of the statute. In our opinion, the statutory remedy is not in the alternative but is in lieu and exclusive of the common-law remedies where applicable." *Id.* at 32, 24 O.O.2d at 364, 193 N.E.2d at 285.

The court ruled that R.C. 2723.01 was the sole means of challenging the fees, because it abrogated all common-law remedies. *Id.* at 30 and 34, 24 O.O.2d at 362–363 and 364–365, 193 N.E.2d at 283–284 and 286.[40]

The instant case is similar to *Paramount Film:*

"The action is against the defendants personally and prays for personal judgments. Appellant relies upon a common-law theory of personal liability for an official who illegally collects or receives property or money. There is no claim of any statutory ground for the suit. The particular remedial basis of the suit rests on quasi-contract principles. The trial court found that the petition did not state a cause of action and gave judgment for the defendants.

"* * *

---

**40.** Appellants cited *Paramount Film* to the trial court as support for their common-law claim in assumpsit.

"In our opinion, the statute [R.C. 2723.01] applies to the fees paid by appellant and operates to exclude any recovery at common law. Since appellant does not, and, on the face of the petition, could not rely upon the statutory remedy [due to the running of the statute of limitations], the demurrer was properly sustained and the judgment for appellees was correct." *Id.* at 30, 24 O.O.2d at 362–363, 193 N.E.2d at 283–284.

Appellants brought their suit under the common-law quasi-contract claim in assumpsit. They seek to impose personal liability upon the Attorney General by alleging that she improperly collected illegal fees. And like the plaintiff in *Paramount Film,* appellants failed to pursue their claim pursuant to the statute.

 As noted above, the Brady fee was similar to the film inspections fees at issue in *Superior Films* and *Paramount Film.* Thus, R.C. 2723.01 was the means by which appellants could challenge the Brady fee and seek its recovery. This conclusion is more compelling when it is remembered that appellants' action in assumpsit was abolished with the enactment of the Civil Rules of Procedure. Appellants not only failed to seek redress through the proper statutory means, they founded their claim upon a now nonexistent action. For that reason, the trial court properly granted summary judgment in the Attorney General's favor as to this claim.

For purposes of clarity, we will discuss the merits of appellants' claim as if their complaint was based upon R.C. 2723.01. Due to the one-year statute of limitations in R.C. 2723.01, only those Brady fees charged after January 12, 1998 would be challengeable. Nonetheless, we will review appellants' issues presented for review, including those relevant only to events prior to January 12, 1998.

2. Pre–*Printz* Period

Appellants first contend that the trial court incorrectly construed Section 922(s) as allowing a handgun transfer to be disapproved for a reason not provided for in the Brady Act—namely, a failure to pay the Brady fee. Appellants' contention is without merit. The trial court did not, as appellants claim, "misread the [statute] to state that it was unlawful for a licensee to transfer a handgun to a non-licensee 'in the absence of a background check conducted within five business days.'" The trial court was only quoting in part from Section 922(s)(1), and a plain reading of the trial court's decision demonstrates that the quote had no bearing on the trial court's resolution of the issue whether BCI&I had authority to conduct Brady checks.

Appellants next complain that the Attorney General lacked authority to act as Ohio's CLEO for purposes of conducting Brady checks. Appellants assert that the Attorney General did not receive permission to act as Ohio's CLEO from every single law enforcement chief or official in the state. R.C. 109.02 provides:

*"The attorney general is the chief law [enforcement] officer for the state and all its departments * * *.* The attorney general shall appear for the state in the trial and argument of all civil and criminal causes in the supreme court in which the state is directly or indirectly interested. When required by the governor or the general assembly, the attorney general shall appear for the state in any court or tribunal in a cause in which the state is a party, or in which the state is directly interested. Upon the written request of the governor, the attorney general shall prosecute any person indicted for a crime." (Emphasis added.)

By statute, the Attorney General is Ohio's premiere chief law enforcement officer. Furthermore, R.C. 109.55 provides:

"The superintendent of the bureau of criminal identification and investigation shall recommend cooperative policies for the coordination of the law enforcement work and crime prevention activities of all state and local agencies and officials having law enforcement duties to promote cooperation between such agencies and officials, to secure effective and efficient law enforcement, to eliminate duplication of work, and to promote economy of operation in such agencies."

By R.C. 109.55, BCI&I is given the primary responsibility of recommending policies that would further, and make more effective, its law enforcement duties.

 Because the Attorney General is statutorily defined as Ohio's primary chief law enforcement officer, the Attorney General could delegate to BCI&I the responsibility of centralizing the Brady check system where such would make it more efficient and effective. Additionally, the ATF, the federal agency responsible for implementing the Brady Act, stated in its Open Letter to all local law enforcement officials that more than one official could be a CLEO within any given jurisdiction. The ATF suggested that local *and state* law enforcement officials coordinate their activities and choose a single entity to act as CLEO. After the Open Letter, the OACP president sent a letter to all OACP members stating that the association agreed that the Attorney General should act as Ohio's CLEO.

Appellants argue that the OACP letter is "unauthenticated" and "does not demonstrate that each Ohio chief of police designated [BCI&I] as CLEO, and says nothing about the sheriffs of Ohio, who are CLEOs for their respective jurisdictions." Unfortunately for appellants, they presented *no* evidence to refute the conclusion drawn by the trial court from the record: that the Attorney General had received permission to act as Ohio's sole CLEO. In fact, the record supports the trial court's conclusion. The correspondence throughout the record demonstrates that the Attorney General was given permission to act as CLEO, and notice of this was sent to local officials. The ATF recognized the Attorney

General's designation as CLEO in its Federal Register. Appellants presented no evidence to infer that any local official objected to the Attorney General acting as Ohio's CLEO. Without presenting some evidence in support of their contention, appellants cannot complain that the trial court reached the incorrect conclusion from the record.

Appellants further contend that the BCI&I lacked authority to conduct involuntary Brady checks and, as a result, BCI&I could not charge the Brady fee for such checks. R.C. 109.55, quoted above, requires that BCI&I cooperate in law enforcement activities and crime prevention within the state. Similarly, R.C. 109.52 provides that BCI&I "may * * * assist in the prevention of crime, and engage in such other activities as will aid law enforcement officers in solving crimes and controlling criminal activity."

As noted by the United States Supreme Court in *Printz,* the Brady Act imposed upon state and local officials an obligation to conduct Brady checks. 521 U.S. at 933, 117 S.Ct. at 2383, 138 L.Ed.2d at 943.

Under the pre-*Printz* Brady system, BCI&I was required, as Ohio's CLEO designee, to conduct the Brady checks. In fact, under R.C. 109.52, BCI&I was authorized to pass on the Brady form to federal officials in the post-*Printz* period. Under both the pre- and post-*Printz* schemes, the Brady check assisted in preventing crime and controlling criminal activity, as it aided law enforcement's efforts to prohibit unauthorized persons from receiving handguns.

Whether BCI&I could charge a fee for the pre-*Printz* involuntary Brady checks requires more discussion, because no Revised Code provision specifically speaks to the issue. As an administrative agency, BCI&I "has only such authority, either express or implied, as conferred upon it by the General Assembly." *Burger Brewing,* 42 Ohio St.2d at 379, 71 O.O.2d at 367, 329 N.E.2d at 695. BCI&I's authority is limited to only these express and implied powers. It may not extend its powers beyond those granted by the General Assembly. *Id.* In determining if an act is within the purview of an administrative agency's powers, the entire administrative or regulatory scheme at issue must be considered. See *id.* at 379–381, 71 O.O.2d at 367–368, 329 N.E.2d at 695–696. Or more fully:

" 'Such grant of power, by virtue of a statute, may be either express or implied, but the limitation put upon the implied power is that it is only such as may be reasonably necessary to make the express power effective. In short, the implied power is only incidental or ancillary to an express power, and, if there be no express grant, it follows, as a matter of course, that there can be no implied grant. In construing such grant of power, particularly administrative power through and by a legislative body, the rules are well settled that the intention of

the grant of power, as well as the extent of the grant, must be clear[:] that in case of doubt that doubt is to be resolved not in favor of the grant but against it. It is one of the reserved powers that the legislative body no doubt had, but failed to delegate to the administrative board or body in question.'" *Id.* at 383, 71 O.O.2d at 369, 329 N.E.2d at 697, quoting *State ex rel. A. Bentley & Sons Co. v. Pierce* (1917), 96 Ohio St. 44, 47, 117 N.E. 6, 6–7.

 It was easily within BCI&I's authority to charge the Brady fee when conducting Brady checks in the pre-*Printz* period. BCI&I is expressly granted the power to charge a fee for those criminal records checks required to be conducted. R.C. 109.572. In other cases where a person requests a records release, BCI&I is allowed to charge a "reasonable fee." R.C. 109.57(E). Because BCI&I was required to conduct Brady checks, such checks were akin to those required by R.C. 109.572. Just as the fee charged for R.C. 109.572 records checks is intended to cover the administrative costs of such checks, the Brady fee was intended to cover the administrative costs of the Brady check system. It would be incongruent if BCI&I were allowed to cover its expenses for all background checks but those required by the Brady Act. Only by charging a fee sufficient to meet its administrative burdens could BCI&I be expected to effectively administer the Brady Act.

 In the pre-*Printz* period, the Attorney General properly acted as Ohio's CLEO for purposes of the Brady Act. BCI&I was authorized to conduct the Brady checks and charge the Brady fee.

3. Post–*Printz* Period

Appellants also raise a number of attacks against the post-*Printz* voluntary Brady check system created by the Attorney General. Appellants first argue that the "waivers" signed by buyers to allow "quick checks" by BCI&I were in fact not voluntary because the buyers did not truly "consent" to the checks. Appellants' argument is superfluous at best. The voluntary system devised by the Attorney General was not mandatory. Nothing required buyers to sign the waivers and subject themselves to the state quick checks. All buyers could, as some did, refuse to sign the waivers, thus requiring federally authorized officials to conduct the Brady check.[41]

 Appellants assert that the waivers were not supported by consideration. Appellants are incorrect. In consideration for signing the waivers, the Attorney General and BCI&I performed the Brady check in two days, rather than five. If

---

**41.** Any disagreement appellants have with the authority of federal officials and other officials not connected with the Attorney General to conduct Brady checks is not a subject of this lawsuit.

time was not important to a particular buyer, the buyer could simply refuse to sign the waiver and have federal authorities conduct the Brady check in five days.

Appellants argue that under either Brady check method they were required to pay the Brady fee, thus making the waivers involuntary. The record demonstrates only that, as to those buyers refusing to sign the waiver, BCI&I acted as a collection agency, keeping for itself only those fees necessary for conducting or verifying record checks. R.C. 109.52 requires BCI&I to assist other law enforcement officials in preventing and controlling crime, and its actions were in furtherance of this mandate. In any case, it is irrelevant that the Brady fee was identical for both Ohio and federal Brady checks when the state provided other significant consideration for the waivers—a shorter check period.

Appellants also contend that the post-*Printz* Brady fee was not authorized by Ohio law. Appellants assert that no relevant statute provided authority to conduct involuntary background checks in this time period. Appellants are correct. Of course, the Brady checks conducted by BCI&I after *Printz* were only those done with the buyer's consent. Ohio was not involved in any involuntary Brady checks after *Printz*. Those were done by federalized deputies.

The Attorney General has the authority to release and review a person's records, with the person's consent, by R.C. 109.57(E):

"The attorney general shall adopt rules, in accordance with Chapter 119. of the Revised Code, setting forth the procedure by which a person may receive or release information gathered by the superintendent pursuant to divisions (A)(2) to (5) of this section. A reasonable fee may be charged for this service."

This statute plainly provides the Attorney General with the authority to release a person's records where that person requests such a release.[42] In accordance with R.C. 109.57(E), the Attorney General devised a method by which a potential gun purchaser could authorize a records release to BCI&I for a background check.[43] BCI&I used the Brady form as the means by which buyers could release their records for a Brady check.[44] Pursuant to R.C. 109.57(E), the Attorney General could then charge the Brady fee for such a records release.

---

**42.** Criminal records are generally prohibited from release by Ohio and federal law, except under specific circumstances authorized by law. R.C. 109.57(D); *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 144, 647 N.E.2d 1374, 1378–1379.

**43.** Ohio Adm.Code 109:5–1–01 recognizes that R.C. 109.57(E) allows a person's records to the released to and received by "any person" where authorized.

**44.** After *Printz,* the federal government continued to utilize the Brady form to conduct involuntary Brady checks. Out of convenience, Ohio used the Brady form as well for voluntary, quick checks.

Appellants make a passing argument that the Brady fee scheme was not created in accordance with Ohio Adm.Code 109:5–1–01. But appellants presented *no* evidence in support of their contention. Although the voluntary Brady check scheme devised by the Attorney General did not strictly require the same information as the administrative regulation, appellants did not present any evidence upon which the trial court could infer that the Brady check system did not comply with the requirements of R.C. 109.57(E).

More important, as discussed above, the Brady fee was impliedly authorized as part of the Brady check system. BCI&I is required to assist and coordinate law enforcement activities to make such more effective. R.C. 109.52 and 109.55. As part of that required activity, BCI&I created the voluntary Brady check scheme. As part of this system, BCI&I had the implied authority to charge a fee to offset its own administrative burdens. The trial court properly found that the voluntary Brady check procedure and the Brady fee related to that procedure were authorized by R.C. 109.57(E).[45]

The voluntary Brady check system was proper and the waivers signed by buyers under this system were valid. The Brady fee charged as part of the voluntary Brady check system was authorized.

4. Recapitulation

Appellants claim in assumpsit did not state a valid cause of action, as appellants were required to seek redress through R.C. 2723.01. Even had appellants stated a viable claim, the Attorney General and BCI&I acted within their statutory authority in conducting Brady checks and charging the Brady fee. The trial court properly granted summary judgment as to appellants' common-law claim. The first assignment of error is overruled.

## E. CONCLUSION

The trial court correctly found that as to the Section 1983 claims which appellants could bring and which were not barred by the applicable statute of limitations, appellants' rights were not infringed by the actions of the Attorney General. Nor were appellants-buyers affected by any conduct taken under color of state law. The trial court also properly concluded that the Attorney General

---

**45.** In fact, the voluntary Brady check system fit well within the text of R.C. 109.57(E), as the necessary documents were sent to BCI&I by FFLs, who thus requested the release and review of buyers' records. The Brady fee was then charged to the FFL, the requesting party. Just as buyers were not affected by the Attorney General in their Section 1983 claim, they were not directly affected by the Attorney General for purposes of their challenge to the legality of the adopted check scheme, other than the release of their records. Any harm suffered by buyers with regard to paying the Brady fee was due solely to the decision of FFLs to pass on the cost of the fee.

and BCI&I acted within their statutory powers when conducting Brady checks and charging the Brady fee. The trial court did not err in granting summary judgment to the Attorney General.

*Judgment affirmed.*

POWELL, P.J., and VALEN, J., concur.